### PEOPLE v. LUMSDEN.

(Supreme Court, Appellate Division, First Department. December 2, 1910.)

1. CRIMINAL LAW (§ 554*)—EVIDENCE—QUESTION FOR JURY.

A jury may reject the testimony of accused on the ground of its inherent improbability, or because it comes from a highly interested witness, or because he has willfully made false statements.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1255; Dec. Dig. § 554.*]

2. HOMICIDE (§ 255*)—MANSLAUGHTER—EVIDENCE.

Evidence *held* to justify a conviction for manslaughter in the first degree.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 539, 541; Dec. Dig. § 255.*]

3. CRIMINAL LAW (§ 778*)—INSTRUCTIONS—PRESUMPTIONS OF INNOCENCE.

The court in charging on the presumption of innocence need only charge in the language of Code Cr. Proc. § 389, declaring that a defendant is presumed to be innocent until the contrary is proved.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1847; Dec. Dig. § 778.*]

4. CRIMINAL LAW (§ 1172*)—APPEAL—HARMLESS ERROR—ERRONEOUS INSTRUCTIONS.

Where the court on a trial for murder charged that the burden of proving every fact essential to a conviction beyond a reasonable doubt rested on the people, that accused is presumed innocent until proved guilty, that the presumption of innocence must be overcome, the error in charging that the presumption of innocence is the presumption that every man performs his duty until the contrary appears, and that it is a presumption that applies to accused and to every citizen who comes on the witness stand equally with accused, and it is not a presumption that the accused is innocent, and that every one testifying is conspiring to testify against him, was not ground for setting aside a conviction of manslaughter indicating that the jury gave accused the benefit of every presumption and every reasonable doubt.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3154, 3155, 3161; Dec. Dig. § 1172.*]

5. CRIMINAL LAW (§ 1165*)—APPEAL—HARMLESS ERROR.

Technical errors are not ground for reversal of a conviction when the court sees that accused was not harmed thereby.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3086; Dec. Dig. § 1165.*]

6. CRIMINAL LAW (§ 829*)—INSTRUCTIONS—REFUSAL OF REQUESTS.

Where the court correctly charged in its own language on reasonable doubt, which might be inferred from proof of good character, the refusal

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of a proper request on the subject not read in the presence of the jury was not reversible error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2011; Dec. Dig. § 829.*]

7. CRIMINAL LAW (§ 364*)—HOMICIDE (§ 156*)—EVIDENCE—RES GESTÆ—LETTERS FOUND ON ACCUSED—DELIBERATION AND PREMEDITATION.

Where the evidence showed that accused was in need of money, and that he had attempted to collect money from decedent, and went to decedent at the time of the killing to collect money from him to inclose in letters written by accused to his creditors, the letters found on accused after the killing were properly received as a part of the res gestæ, and as bearing on the question of deliberation and premeditation.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 804, 810, 813; Dec. Dig. § 364;* Homicide, Cent. Dig. § 287; Dec. Dig. § 156.*]

8. HOMICIDE (§ 338*)—HARMLESS ERROR—ERRONEOUS ADMISSION OF EVIDENCE.

Where accused was found guilty of manslaughter in the first degree, the error, if any, in admitting evidence bearing on the question of deliberation and premeditation, was harmless.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 713; Dec. Dig. § 338.*]

Appeal from Court of General Sessions, New York County.

John D. Lumsden was convicted of manslaughter in the first degree, and he appeals. Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, SCOTT, CLARKE, and DOWLING, JJ.

Martin W. Littleton (Owen N. Brown, on the brief), for appellant. Charles S. Whitman, Dist. Atty. (Robert C. Taylor, of counsel), for the People.

CLARKE, J. The appellant was indicted for murder in the first degree for shooting one Harry B. Suydam with a pistol on December 19, 1908. Two shots were fired, causing a perforating wound in each breast, from the effect of which Suydam died on the 21st. Appellant was 31 years of age. He had lived for 30 years in Raleigh, N. C., and Birmingham, Ala. He had been a player in an orchestra, and had served in the Spanish War as a private and as a member of the band in the First North Carolina Volunteer Infantry. He had invented a "massage vibrotator," although the patents had not been issued therefor.

In April, 1908, he was introduced to Suydam, who was a curb broker in the city of New York, by one Jacob, with whom he was having negotiations in connection with this invention. A corporation was formed under the laws of the state of New Jersey, of which, at first, the appellant was made president and Jacob the treasurer. Thereafter he resigned, and Jacob was made president and Suydam treasurer. Appellant assigned his rights under the patent applied for to the company. On or about June 22, 1908, he delivered to Jacob and Suydam 750 shares of his stock in the corporation for the purpose of being used as collateral for a loan and received therefor demand notes signed by Jacob for $650; the agreement being that $1,250 should be borrowed from which he was to be paid $650, the balance to be used in the business of the company. The appellant

stated that the loan was negotiated, but that he was not paid the sum due on said notes. He demanded payment several times, threatened to take the matter to the district attorney and to the manager of the curb, and began a suit in the Municipal Court. After the service of the summons, he saw Suydam on or about October 10, 1908, told him that he had seen several people in trying to straighten out the company, and had failed to do so. "Suydam said: 'I see you have brought that action.' I said: 'Yes.' He said: 'Well you stand a hell of a chance of getting a judgment.' I said: 'I will see the district attorney if it becomes necessary, and, in any event, I will collect my money.' Suydam said: 'If you ever come around here again with those notes, you will get yourself in one hell of a fix.' "

On Thursday, December 17th, he borrowed a revolver from a friend, telling him that he was going down to Broad street to meet a man who owed him money and he had made several threats. His own revolver was then in pawn, and he did not have the $2.80 necessary to redeem it. On Friday morning he took out of his trunk a box of cartridges which he said he had procured some time before in Birmingham, Ala., which fitted the borrowed pistol as well as his own; loaded the five chambers of the revolver, and put seven loose cartridges in his vest pocket. He wrote on said day two letters, one to a savings bank in Raleigh, "I inclose $50.75 in payment of note due January 15, 1909, with interest," and the other to a national bank at the same place, "Inclosed find money order for $400 in payment of note which falls due on January 7, 1909." These letters were found on him after the homicide, and he testified that he had no funds with which to meet those notes, and that he wrote the letters expecting to get the money from Suydam, place it in the letters, and send it to the banks. On Saturday morning, December 19th, he went to Suydam's office, which was located on the first floor of No. 39 Broad street, overlooking the curb market on said street at about 10 minutes of 10. There were present in the office at the time Mr. Collins, a man of 64 years of age, whose only connection with Suydam was that he rented him desk room, Meyer, an office boy of 17 years of age, and Downs, Suydam's clerk, a young man 25 years of age. Suydam sat at his desk at the window in the front of the office. As appellant came in, Suydam turned round in his chair, and bade him "Good morning." Appellant answered "Good morning." Suydam asked him if he would have a seat. He replied: "I don't wish to sit. I wish to speak to you a minute outside." The two immediately stepped into the hall, and had five minutes' conversation. For what occurred there we only have appellant's testimony. He said he showed Suydam the notes, and asked him for the money.

"I did not tell him that I had written those letters. I did not tell him I had to have the money. I made no statement whatever to him as to my pecuniary condition or that I needed the money. * * * Q. And, of course, you made no threats against him? A. No, sir. I told him that, if he did not pay, I would go to the district attorney. That was the only threat I made. * * * Q. Did you tell him you had a revolver? A. I told him I was prepared in case he attempted to do anything. At the time that I made this statement to him he had said, 'You remember what I told you the last time you were down here?' And that was that I would be in a hell of a fix.

He did not say whether that would be a legal fix, financial fix, or what kind of fix. Q. And all he said to you then was to remember what he last said to you? A. Yes, sir. Q. And you told him that you were prepared? A. Yes, sir. Q. What were you prepared for? A. I was prepared to protect myself in case I was attacked. I had no reason to believe I was going to be attacked, except as I have stated to this jury. I didn't know whether or not Suydam was armed. To the best of my knowledge and belief, he was not. To the best of my knowledge and belief, Meyer, Collins, and Downs were not armed. * * * I did not tell Suydam in the hall that I had a revolver in my pocket, and did not show it to him while there. I followed him back into the office. It was outside in the hall that he told me he would pay me the money when the market opened. * * * He said: 'Come into the office and wait until the market opens, and I will get the money for you.'"

After returning to the office, they went over to the window, and Suydam stood with one foot on a chair and leaning his head on his hand. Appellant stood with his hands in his overcoat pockets. There was a little conversation about a machine. Suydam said he had sent one to a certain person to be fixed and appellant said, "Did you?" About 5 minutes of 10 Downs came over to the window to see if the crowd was in the street. He said it was 3 minutes to 10. "I am going down to get the opening." Suydam said: "Do you know about that order?" Downs said, "What order?" and walked towards him. Thereupon Suydam said: "For God's sake help me, George. He is going to shoot, get that gun," and threw his arms around appellant's shoulders with his hands at the back. Downs jumped to the back of appellant, who whirled his pistol out of his overcoat pocket where he had been holding it in his hand, as he testified, and, before they could get hold of his hand, he turned it in and fired twice, hitting Suydam under the right nipple and under the left nipple. Thereupon a scuffle took place. They all fell to the floor. Collins jumped in and shook the pistol out of appellant's hand. Downs got it and then threatened to kill him. Meyer had been ordered to get an officer who ran in. Collins took the pistol away from Downs. Appellant was arrested, and Suydam was taken to the hospital in an ambulance.

After the shooting and while still in Suydam's office, the appellant denied that the gun was his. "I can show you that I had no revolver when I came here, and I can show you my revolver is in pawn," and he showed a pawn ticket for a revolver. He also said that he shot the man in self-defense, and that he took the revolver from Suydam's pocket.

He made a voluntary statement at police headquarters to a deputy assistant district attorney:

"I have been after Suydam for quite a while to get him to take up the notes. I need the money. I went there this morning, and he told me, 'I will pay you these notes when the market opens.' That was a few minutes before 10 o'clock. He and I were standing by the window, in his front room there, and without any warning he was on me and had me on the floor—got me down. There were three of them. It is hard to describe exactly what happened because it was so quick—glass breaking and everything, all over me— two or three punching me in the face, the crowd on top of me. I thought my leg was broken, and, in this mixup, a gun went off. Q. Who fired the gun? A. I don't know whether I fired it or whether they fired it. Everybody had their hand on it. I grabbed him and he grabbed me. Q. Whose gun was it?

A. His gun. I grabbed the gun, and he grabbed the gun, and then we had a tussle and everybody had hold of the gun. I knew Suydam was dangerous. I knew that he had—he has told me several times—he has kind of threatened me when I would go there to collect the notes—told me I would get myself in a hell of a fix, and all that sort of thing. I thought I would take my pistol there this morning. I have had it in a pawn shop up in Ninth avenue. The ticket for it is in my pocketbook there that the officer has. I had a box of cartridges that I bought with the pistol several years ago in Birmingham. I took enough of these cartridges to fill my gun, and was going to get my gun when I went there in case there was any trouble. I hadn't the money to get my gun out. It took $2.80, and I didn't have the money, so consequently I couldn't get it. That accounts for my having the cartridges in my pocket. The rest of the box of cartridges can be found in my trunk, they have been there for several years. They can be found in my trunk at my address. Q. Did you have any kind of a weapon in your possession? A. I had nothing but a little corn knife, used for trimming corns that I carry in my pocket for sharpening pencils. That's all I had. * * * About 10 minutes to 10 he and I were standing over by the window talking and without any warning he hit me or shoved me, and I grabbed him and we went on the floor, and I grabbed this gun in his hand and the others piled on top of me. There were a half dozen hands on the gun, but I had mine on it—I grabbed it. Q. When did you first catch sight of it in his hand? A. He had it in his hand when he grabbed me. Q. Did you see the gun before he grabbed you? A. Yes; and I grabbed it as soon as I spied it in his hand, and he and I went down. * * * Q. What part of the gun did you have hold of? A. I couldn't tell you. That's hard to tell. Q. How was he holding the gun, if you know, when you first got sight of it? A. I presume he had it by the handle. He had taken it from his pocket. I couldn't tell you what pocket. I was looking out of the window when I saw him move and grab it. * * * By Capt. Carey: Q. Now, you have told us about having the pistol in pawn, and you had intended to get that pistol and take it with you to this place. [Interrupting] Yes; I realized the man was dangerous because he had threatened me, and I thought it would be a good idea to have it in my pocket, if I should go there, to protect myself in case something should happen. I didn't have the money to get it, and didn't take it. Q. But you intended to take it? A. Yes. Q. And you didn't take any pistol there with you? A. No, sir. By Mr. Symonds: Q. Did you ever get your hand on the trigger of this revolver which you say Suydam had? A. I couldn't tell whether I had my hand on the trigger or not. * * * Q. Did you have any previous dispute over the payment of these notes? A. No dispute, only I presented them to him and he put me off. By Capt. Carey: Q. Isn't it a fact that you had that pistol in your hand and one of the men in the office took that pistol out of your hand? A. No, sir. The pistol, I never did see what became of it. They were yelling, 'Get the pistol, get the pistol.' The officer found it some place, this man that was in here. * * * Q. Did you ever get the pistol in your possession? A. No, sir. Q. How many shots were fired? A. Two, I think. Q. Do you know whether there was any appreciable interval between the two shots? A. Sounded right together—one right after the other. Q. Where were you at the time, at the moment. A. [Interrupting] I was on the floor. Q. Do you know where Suydam was at the instant the shots were fired? A. No, sir. * * * Q. If you were the custodian of that pistol when you went into that office, you had better let us know now? A. I never had that pistol in my possession. I have told you that."

The appellant took the stand. His testimony was in direct contradiction to his statements made immediately after the shooting. He testified, as hereinbefore stated, that he had borrowed the revolver, loaded it with his own cartridges, and had it with him in his overcoat pocket, holding it by the butt in his pocket, when he was in Suydam's office; that the pistol had a safety lever at the back of the butt, so that the trigger could not be pulled unless the butt was squeezed.

"I took the revolver in my overcoat pocket so it would be convenient in case I was attacked, so I could pull it quickly." He had turned the gun in the direction of Suydam, and, when he turned the gun in his direction and pulled the trigger, he intended to shoot. "Q. Was Suydam inflicting any bodily injury on you when you turned the gun on him? A. No, sir; only trying to turn the gun on me. Q. You know Suydam could not fire that gun unless he had hold of it in the way I have got it, that it was a safety gun? A. I know that."

Against the positive and unshaken evidence of the three eyewitnesses that all that was done before the shooting was an attempt to disarm him, the appellant opposed only his own testimony in support of his claim of self-defense from a brutal and unprovoked assault. The jury were at liberty to reject this defense, not only from its inherent improbability and that it came solely from a highly interested witness, but also from the willful false statements, his denial of ownership or possession of the pistol, and his attempt to fasten said possession and use upon the decedent. They were entitled to reject his account of the conversation in the hall, and could have found that he had undoubtedly made some threats because Suydam must have learned from him that he had the weapon in his pocket, for otherwise he would not have called for help "to get that gun." In view of the deliberate steps taken by the appellant in procuring and loading his weapon, the possession of a pocketful of extra cartridges, his pecuniary necessities, and his admission that he carried the pistol in his hand in his overcoat pocket, ready for instant use, we think the jury, in finding him guilty of manslaughter, gave him the benefit of every reasonable doubt that could be entertained upon the facts shown.

It is claimed that a fatal error was committed in the charge. The learned court charged:

"The people of the state assert that he is guilty as charged in the indictment. This he denies, and the burden of proof rests upon the people, and it is incumbent upon the prosecution to prove his guilt beyond a reasonable doubt of some one of the offenses of which it is possible to convict under this indictment, and, if it has failed to make such proof beyond reasonable doubt, it becomes your duty to return a verdict of not guilty. All the presumptions of law independent of evidence are in favor of innocence, and every person is presumed to be innocent until he is proved guilty. This presumption is not a special shield which the law puts around a defendant. It is founded upon a wider and deeper basis than that. It is the same presumption which attends you, and attends all of us in all of the transactions of life. It is the presumption that no man does wrong. It is the presumption that every man performs his duty until the contrary appears. It is a presumption that belongs to the prisoner. It is a presumption which belongs to every witness who comes upon the witness stand, equally with the prisoner. It is not a presumption that the prisoner is innocent, and that every one who testifies against him is conspiring to testify against him, but the same presumption of innocence which protects him protects every person who has any connection with the decision of the cause."

The clause commencing, "This presumption is not a special shield," etc., is objected to. It was unfortunately so loosely worded as to give color to the claim that the presumption that a witness speaks

the truth is of the same weight as the presumption of innocence of the defendant. The court, however, was quite unnecessarily elaborating the subject of presumptions in general. The Criminal Code of Procedure, § 389, provides that "a defendant in a criminal action is presumed to be innocent, until the contrary be proved." That provision is precise, generally understood, based on the common law and requires as a rule no explanation. An attempt to explain the obvious often leads to confusion.

But the charge immediately proceeded:

"The burden of proving this case rests upon the people of the state and up to the standard employed in the phrase 'proof beyond reasonable doubt,' and I wish to say to you, gentleman of the jury, in relation to this, as I shall say in relation to every part of the case, and you will take it with you as part of every instruction in relation to any fact, that the people must satisfy you of any fact, on which it relies, beyond a reasonable doubt."

After defining the different grades of murder and manslaughter and giving general instructions thereon, the court proceeded:

"You have heard in the consideration of the issues in this case many witnesses called both by the counsel for the people and the learned counsel for the defense. You are to lay the testimony of those witnesses alongside of your own observation and experience, and determine the truth with reference to them. What is your duty, gentlemen of the jury, with reference to the consideration of the testimony of witnesses? You are to take their testimony, and, if possible, reconcile their conflicting statements, to make due allowance for honest errors, and to accept the suggestion of perjury reluctantly and from necessity, for it is the general observation that all testimony is at the risk of imperfect knowledge and imperfect memory. Witnesses who appear equally entitled to credit may give different accounts of the same transactions, the difference going to the substance and effect and sometimes only to immaterial details. In such cases you have substantial identity and circumstantial variety. Too much importance should not be attributed to such differences to discredit a witness. You may believe that they intend to tell the truth unless the contrary is reasonably clear, and, as far as you can, seek to harmonize their testimony and discover for yourselves the substantial truth. In weighing the witnesses you must weigh them giving regard to their grade of life and their intelligence, for you are the sole judges of the weight of the testimony and the credibility of witnesses. The statements of the witnesses are to be considered by you and weighed with due regard to their relation to the case as in point of the bias or prejudice that they may have in respect to the parties or the subject-matter under investigation; to contradictions, to previous inconsistent statements, to their knowledge of the facts and their apparent disposition to make just and true disclosures, and to their known or ascertained character. A good deal of credit is due to every person who has occasion to speak in a court of justice under his oath, and a certain degree of infirmity may and often does attach. The memory may be defective, the events and dates may be confounded. Witnesses, simpleminded and honest, frequently contradict themselves and each other. * * * You should take this testimony and carefully and impartially consider the evidence you have heard, in view of the consequences to the defendant at the bar and the people of the state of New York. * * * I have purposely refrained from saying anything to you upon the facts here. They are for you, and not for me. Whatever impressions have been made upon your minds in regard to the effect of the facts on the question involved belong to the accused and the people of the state of New York unhampered in their force by any other influences. I have been asked by the learned counsel for the defendant to charge you upon some propositions of law, as follows: (1) The defendant is presumed to be innocent until he is proved guilty. This presumption of innocence attends him throughout the entire trial, and the bur-

den throughout the entire trial is upon the people to prove beyond a reasonable doubt that the defendant is guilty. I so charge. (2) This presumption of innocence extends to each and every item of proof during the course of the trial, and every reasonable doubt as to each point in the people's case must be resolved in favor of the defendant. I so charge. * * * (10) The presumption of innocence is evidence in behalf of the defendant, which must be overcome by the people, and, when the evidence is weighed, this presumption must be cast into the scale on the defendant's side, and unless the evidence in behalf of the people overcomes this presumption, together with the other evidence in behalf of the defendant to such an extent that the people's case is proved beyond a reasonable doubt, the defendant must be acquitted. I so charge."

Those three requests, so made and so charged, at the close of the charge, were the last suggestions to the jury upon the subject of the presumption of innocence, and clearly cured any technical defect in the statement objected to, made at the beginning thereof. The verdict for such an error should not be overthrown, especially when it appears to the court that the jury by its verdict has given the defendant the benefit of every presumption and every reasonable doubt. Technical errors are no longer in this state ground for reversal of a criminal judgment when the court sees that the defendant took no harm thereby.

The court also charged that each juror must be convinced beyond a reasonable doubt, and, if not, the defendant could not be convicted; that they were the exclusive judges of all the questions of fact in the case; that every issue of fact must be determined by them alone. When the defense of self-defense is interposed, the burden of proof is not upon defendant to satisfy the jury of the truth of that defense. The burden is upon the people throughout, and, before the defendant can be convicted, the jury must be satisfied, beyond a reasonable doubt, upon the whole case that the killing was not done in self-defense, and that the defendant is guilty. If in the minds of the jury there is reasonable doubt that the killing was done in self-defense, the defendant must be acquitted. The jury may disregard any testimony which they believe to be not in accordance with the facts either by reason of the witness' mistake or intentional misstatement. If the jury believe that the defendant was attacked by more than one man and that, as a result of this attack, he had reasonable ground to believe that he was in danger of death or great bodily harm, he was justified in shooting either or both of his assailants, and whether or not he shot the man who was doing the most of the acts which caused him to have this fear is of no consequence. He was not obliged in the heat of this scuffle to wait until he had an opportunity to shoot the man from whom most was to be feared. Whether or not at the time of the shooting facts existed which justified the defendant's belief that he was in danger of great bodily harm is immaterial, so long as the defendant had reasonable grounds to form such belief and did form such belief. Whether or not at the time of the shooting facts existed which justified the defendant in believing he was in danger of great bodily harm is immaterial, so long as the defendant did actually have this belief. So that the only defense set up in this case, namely, self-defense, was left to the jury in the precise language suggested by defendant's counsel with iteration and particularity.

Objection is made that one request with regard to the reasonable doubt which might be inferred from proof of good character was not charged in the exact words requested. The court did not deny any of the requests on this subject, but charged in reference to proof of good character in its own language, embodying most of the five requests and clearly covering all that the defendant was entitled to. The particular request referred to might perhaps have been charged, but it would have added nothing to what had been said. As that request was not read in the presence of the jury, the denial thereof could have had no influence upon them. The exception is unsubstantial.

The reception in evidence of the letters was not reversible error. They were part of the res gestæ, they were found on the defendant, and they bore upon the question of deliberation and premeditation; but, as the defendant was not found guilty of murder, they were harmless, even if improperly admitted.

We have carefully examined the whole record and considered all of the exceptions appearing therein, and are of the opinion that the defendant had a fair trial, that he was undoubtedly guilty of the crime whereof he has been convicted, and that no errors were committed sufficient to require us, in the interests of justice to order a new trial.

The judgment appealed from should be affirmed. All concur.