The judgment of conviction should, therefore, be reversed and a new trial granted.

PATTERSON, O'BRIEN, McLAUGHLIN and LAUGHLIN, JJ., concurred.

Judgment reversed and new trial granted.

## Court of Appeals.

June 24, 1903.

## THE PEOPLE v. CLARENCE EGNOR.

(175 N. Y. 419.)

1. MURDER—EVIDENCE.

    The evidence upon the trial of an indictment for murder examined and held sufficient to warrant a verdict convicting the defendant of the crime of murder in the first degree.

2. INSANITY—WHEN QUESTION OF FACT.

    Where a person charged with murder, and to ordinary appearances sane, defends upon the ground that he was legally irresponsible at the time because yielding to an ungovernable impulse, as the expression of a form of epileptic disease, the determination whether such was the fact depends upon the inferences to be drawn from the evidence, and must be made by the jury, not by the Court of Appeals.

3. WHEN SANITY MUST BE PROVED BEYOND A REASONABLE DOUBT.

    Where the defendant has given evidence tending to show that at the time he committed the homicide he was insane, the prosecution must prove his sanity at that time, not only by a preponderance of evidence, but his sanity must be proved beyond a reasonable doubt, and a charge that as a whole instructs the jury to that effect does not present reversible error.

4. WHEN ADMISSION IN EVIDENCE OF CONFESSION IS NOT ERRONEOUS.

    Reversible error cannot be predicated upon the admission in evidence of a confession made to a prison keeper by the defendant, who while confined in State prison killed an official, to the effect that he had killed him, where the jurors are instructed that the confession should be disregarded if they determined that it was involuntary.

APPEAL from a judgment of the Supreme Court, rendered at a Trial Term for the county of Cayuga February 23, 1901, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

George W. Nellis and Amasa J. Parker, for appellant.

Henry T. Dayton, for respondent.

GRAY, J.: The defendant was charged in the indictment with the crime of murder in the first degree, for having killed Archibald W. Benedict, a keeper in the State prison at Auburn, on January 9th, 1901, by a blow with an iron bar and with a pistol shot. Being tried upon the indictment, he was found guilty of the crime charged, upon the verdict of a jury, and was sentenced to be put to death. That the defendant killed Benedict is not disputed; nor is it in doubt upon the evidence. The defense relied upon is that of insanity and much evidence was admitted to show that the defendant, then in the twenty-third year of his age, was, and had been since his childhood, an epileptic. It is claimed that the killing of Benedict was the result of an attack of epileptic furor, or mania, and that the defendant was insane therefrom and, hence, irresponsible. He was a convict in the State prison and, on the day in question, was in the workshop of the prison and engaged with other convicts in the tasks assigned them. Benedict, at the time, was in command of the gang employed in the shop. The defendant's attack upon him was described by two witnesses of the occurrence. Whether there had been any altercation, or conversation, prior thereto, does not appear. Each witness, in substance, stated that, when his attention was called to the disturbance in the shop, he saw the defendant standing behind the deceased, who appeared to be in a helpless condition, with

his head drooping and with his hands down by his side, and that the defendant was drawing from the hip pocket of the deceased a revolver, which he discharged at a point in the back of his neck. One of the witnesses states that, as he turned to see what was occurring, he heard something drop on the floor, like a yard stick, and, subsequently, an iron bar was found upon the floor, near to where the deceased lay. After the defendant had discharged the revolver, he placed it in his pocket, put on his coat and hat, and walked out or the shop. An autopsy performed upon the deceased disclosed a wound upon the forehead and a fracture of the skull, as from a blow by a blunt and heavy instrument, and a pistol-shot wound in the back of the neck, at about the base of the brain, either of which might have caused death. Upon leaving the shop, after his assault upon the deceased, the defendant, seeing Martin, another of the prison keepers, approaching the shop, called him by name and said: "I have killed Benedict." Upon Martin's asking him how he had done it, he replied, "I hit him on the head and shot him." Martin, seeing him put his hand in his pocket, asked him what he had there, to which he replied: "I have got his gun," and he gave it up. A few minutes later, when in the office of the prison jail, the defendant further said to Martin that he was sorry and did not mean to kill Benedict, and again: "I shot him; I don't whether I killed him or not."

The evidence showed, or tended to show, that the deceased had been severe and harsh in his treatment of the convicts under him; that the defendant was angered by his confinement in the prison jail, for some breach of discipline, a few days previously, and that he had expressed himself to various persons, upon prior occasions, in violent terms and had manifested a vindictive and threatening demeanor towards the deceased. The evidence was sufficient to establish that the defendant killed the deceased by the blow from the bar or by the

pistol shot; that there was a motive and that the killing was with premeditation and deliberation.

The defendant was not sworn in his own behalf, but friends and members of his family testified to insanity in relatives, and they and a physician gave evidence that, when a lad, the defendant was subject to seizures of an epileptic character. Some of them testified that up to the seventeenth or eighteenth year of his age he would act in a foolish and irrational manner. Opinions of acquaintances and of associates were given that, in his conduct, he impressed them as being irrational. From the evidence it was possible to infer that the disease had assumed in the defendant the form of masked, or minor, epilepsy. The evidence revealed conditions of birth and of environment which might affect a normal or healthful physical development, for he was conceived of an inebriate father and was, as a child, subjected to brutal treatment and physical injury at the hands of a stepfather.

It appears that a person who has suffered from epilepsy in the major form, or grand mal, as it is technically termed, in which the expression is usually through convulsions, may, later, pass into the stage of minor epilepsy, or petit mal, which is the more dangerous form, because of liability to sudden attacks of maniacal paroxysms, or of epileptic furor. The victim of such attacks is unconscious of his conduct and usually, but not universally, will not remember what has occurred.

During the four or five years prior to the homicide, the evidence does not disclose that the defendant exhibited any manifestations of epilepsy, in seizures, or in characteristic attacks. Physicians, who examined him in the prison, testified in his defense and stated, as the result of their examinations and in answer to hypothetical questions, which resumed all the facts in evidence concerning him, that it was their opinion that the defendant was suffering from epilepsy and that, when the homi-

cide was committed, he was irresponsible, because the victim
of an epileptic mania. They considered, upon the history of
the case, that he had, as a child, suffered from epileptic con-
vulsions and that the disease had changed in him to the masked
form, or petit mal.

On the part of the People witnesses were sworn, who had
observed his conduct during several years, before he was sent
to the State prison and while there, and they testified, all,
that he impressed them as perfectly rational and, some, that
he was pleasant and reasonable and a good workman. Physi-
cians examined him, at the request of the district attorney,
and they testified, as the result of their examination, that they
found no evidence of epilepsy, or of epileptic furor; that, in
their opinion, the defendant had had no epileptic seizure and
that he was capable of knowing the nature and quality of
the act he had committed. One of them admitted the defend-
ant's mental condition to be imperfect and that he may have
been an epileptic; but he said that he found no evidence of
it at the time of the examination. Upon the defendant's phy-
sical examination, it was their opinion that he appeared to be
controlling his muscles and stated that, upon his attention being
diverted, responses were exhibited which would be expected in
a more or less normal condition of health. In addition to this
medical expert evidence, the testimony of the two witnesses to
the homicide and of other persons, who saw him immediately
before and after, as to his appearance and demeanor, tended to
show an utter absence of any indications of epileptic disease,
or of a maniacal condition. Whether, upon a consideration ·
of all of the evidence adduced, the defendant was laboring
under a defect of reason, at the time of his attack upon the
deceased, as the subject of epileptic mania, was a question for
the determination of the jury. It was a disputed question of
fact. The defense of insanity is perfectly proper to be urged,
but when a person, charged with the commission of a criminal

act, and to ordinary appearances sane, defends upon the ground that he was legally irresponsible at the time, because yielding to an ungovernable impulse, as the expression of a form of epileptic disease, it is clear that to determine whether such was the fact must depend upon the inferences to be drawn from the evidence. Such a determination, under our laws, is for the jury to make, not for this court. We may assume that the defendant had, in his earlier years, been an epileptic and that he had suffered from the disease in an aggravated form, but that the subsequent stage developed which rendered him a dangerous and irresponsible being, is not at all certain. Indeed, aside from the opinion evidence of the physicians who examined him, that is not at all clear by evidence of acts or of demeanor, and it seems to me that, in such a situation, the jurors were well warranted in not believing that the mind of the defendant was in an unsound state, to such a degree that reason and judgment were overwhelmed and that he acted from an uncontrollable impulse and as an involuntary agent. The jurors had the witnesses before them and, in listening to their testimony, could observe the manner in which they gave it. They could determine not only the credibility of the witnesses, but also the reliance to be placed upon the testimony, in the light of the opportunities and of the facts which formed the basis for the opinions expressed. The issue was for them to decide and this court should not invade their province and interfere with their decision, because of doubts entertained upon the evidence. (People v. Rice, 159 N. Y. 400.) If the evidence may justify the verdict, then the jurisdiction of this court to review the judgment of conviction must be confined to the examination of the record, that it may see whether the conviction was reached upon a fair trial, or whether such errors or mistakes were committed therein as to make it probable, or possible, that the defendant was prejudiced and, therefore, in the interests of justice, that he should have a new trial.

(People v. Hoch, 150 N. Y. 291.)   In this case, it cannot, reasonably, be said that the defendant was conclusively proved to have been acting under an attack of epileptic mania, or to have been unaware of what he was doing.   The evidence to the contrary might well have convinced the jurors.   The general rule is that every person is to be presumed to be of sound mind until the contrary appears and no person is excused from criminal liability on account of insanity, except upon proof satisfying the jury that, at the time of doing the criminal act, he was laboring under such a defect of reason as either not to know the nature of the act he was doing, or that it was wrong.   (Penal Code, sec. 21; 3 Greenleaf on Evidence, sec. 5.)

There are but two errors assigned by the appellant, which require any discussion by us.   The trial judge, in a charge which was not actually excepted to and which fairly and dispassionately instructed the jurors upon the law applicable to the facts of the case, presented the question of the defendant's insanity as follows: " Was the defendant insane upon this occasion ?   The law presumes that a man is sane and responsible for his acts.   The presumption of the law is that on the 9th day of January, 1901, at the time of the killing of Archibald Benedict, the defendant was sane and responsible for his acts.   The defendant is not bound to satisfy you that he was insane at the time beyond a reasonable doubt, but he must overcome the legal presumption of his sanity.   After he has given evidence tending to show that he was insane, then that presumption is rebutted and the prosecution must prove his sanity at the time by a fair preponderance of credible evidence in the case."   Proceeding then to discuss the legal responsibility of lunatic, or insane person, for crimes committed by him and the evidence adduced to show that the defendant was subject to epileptic seizures and that he was an irrational being, the trial judge further instructed the jury to take the evidence

into consideration and said: " If you are not satisfied beyond a reasonable doubt that the defendant was sane and responsible for his acts at the time, then your verdict will be one of acquittal on the ground of insanity." Having concluded his charge, he was specifically requested to charge " that the defense, having given evidence of insanity, that the burden is on the people to prove sanity beyond a reasonable doubt." To this the court replied: " I charge you that the duty is upon the people to satisfy you as to the sanity of the defendant by a preponderance of the evidence, but, in considering that evidence, if you have any reasonable doubt as to the defendant's sanity at that time, he should be acquitted upon the ground of insanity." The defendant's counsel then excepted. It is argued in his behalf that not only did the trial judge commit an error in his charge, when saying that, after the defendant had rebutted, by evidence, the legal presumption of his sanity, " the prosecution must prove his sanity at the time by a fair preponderance of the credible evidence in the case;" but that the further instruction, given upon the request, was erroneous. If what was charged was subject to the objection that it dispensed with the necessity on the part of the prosecution to prove defendant's sanity beyond a reasonable doubt, it was erroneous. The defendant was entitled to have the jury so instructed. It was said upon the argument, that the case of People v. Nino (149 N. Y. 317) was authority for the proposition that the prosecution was only bound to prove the defendant's sanity by a fair preponderance of the evidence, and the opinion in that case (at page 328) might seem, upon a casual reading, to lend support to that view. But the question in its present shape was not presented, nor under consideration, there. The trial judge in People v. Nino had instructed the jurors that the defendant's defense of insanity " must be clearly proven " and that was condemned. The general observation of the learned judge, who spoke for this court,

and which was referred to upon this argument, was inadvertently made, while discussing the error committed upon the trial of Nino, and no inference must be drawn therefrom that a defendant, relying upon the defense of insanity, is not entitled to the instruction that the prosecution, when he has given evidence in rebuttal of the presumption of his sanity, must satisfy the jurors beyond a reasonable doubt as to his sanity. The request which was made to that effect upon this trial was, in fact, charged. The correctness of the proposition of law was conceded by the trial judge in his ruling upon the request as it had been in the body of his charge; and the jurors could not have failed to understand it and to carry with them, in their deliberations upon the issue, the emphatic final words of the judge to them upon the subject. The criticism upon the observation in the main charge is not fair nor reasonable, for it isolates a portion and claims error, instead of considering together all that was said by the judge as to the burden of proof. I think the jurors were clearly instructed upon the law that a verdict of guilt must be reached without entertaining any reasonable doubt upon the evidence as to the defendant's sanity.

The other error assigned is the admission of Keeper Martin's evidence as to what the defendant said to him after the commission of the criminal act. It is argued that his confession was necessarily involuntary, because the prison discipline obliged him to answer the questions of the officers, under the penalty of punishment for a refusal to do so. With respect to what the defendant said to Martin upon leaving the workshop, it was clearly voluntary upon his part, and as to what he further said when placed under arrest in the jail office, that was equally, in my opinion, a voluntary statement, made without the slightest compulsion, inducement or intimidation. Of course, his confession was not essential to prove the commission of the crime, for that was established by witnesses. Its importance is solely as evidence establishing the defendant's

rationality and his perfect consciousness of the nature of the act he had just committed. The rule, which excludes confessions extorted by fear, induced by hope, or which a defendant may be entrapped into making, by officers of justice, can have no application to such a case as this, where the defendant admits his criminality in conversation with his prison keeper. But the trial judge was so cautious, in behalf of the defendant's rights in this particular, that, when commenting upon that part of the evidence, he instructed the jurors that they should disregard it if they determined the defendant's statements to the prison keepers to have been involuntary.

No error, in my opinion, calls for a new trial upon the indictment, and I advise the offirmance of the judgment of conviction.

VANN, J. (dissenting): The sanity of the defendant was an essential element of the crime with which he was charged, and the law required it to be established on the trial as a part of the case for the prosecution, for there can be no criminal intent when, from defect of reason, the accused cannot tell right from wrong. (People v. McCann, 16 N. Y. 58, 66; Brotherton v. People, 75 N. Y. 159, 162; Walker v. People, 88 N. Y. 81, 89.)

In the absence of any proof upon the subject, sanity is established by the legal presumption that every man is sane until the contrary appears, and hence no evidence was required from the People, in the first instance, in relation to that issue. (Penal Code, sec. 17.) The burden of overthrowing this presumption and of showing insanity was upon the defendant, who alleged it as a defense. (Brotherton v. People, 75 N. Y. 159, 163.)

When, however, much evidence had been given in behalf of the defendant tending to show that he was insane at the time of the homicide, the burden was shifted to the prosecu-

tion of establishing his sanity beyond a reasonable doubt, the same as the burden of proving the fact of killing with the statutory intent, for " an act done by a person who is . . . insane is not a crime." (Penal Code, sec. 20; Criminal Code, sec. 389.) While the rules governing the admission of evidence are the same in civil and criminal cases, those governing the weight and effect of evidence, after it has been admitted, are radically different. The rule that a preponderance of evidence is sufficient to establish an essential fact is confined substantially to civil cases and, except in a few instances not now important, has no place in the criminal law, which is governed, so far as the prosecution is concerned, by the more exacting rule of proof beyond a reasonable doubt.

The difference between the two rules consists in the amount of evidence necessary to establish a material fact and is founded upon the humane presumption of innocence which attends every person accused of crime until a verdict of guilty is rendered against him. The trial of a civil action starts with no presumption in favor of either party and the verdict follows the preponderance of evidence, however slight. On the other hand, every criminal trial starts with the affirmative presumption of innocence and a mere preponderance is not enough to overcome that presumption, for the law requires that every fact essential to guilt, except in this case the simple death of the victim, shall be proved to the satisfaction of the jury beyond a reasonable doubt. (Penal Code, sec. 181.) The distinction is so substantial as not infrequently to control the verdict and it was the legal right of the defendant to have the jury instructed as to the amount or weight of evidence required to convict him, in such clear and unmistakable terms that no confusion upon the subject could arise in the mind of any juror.

When, therefore, in the body of his charge the learned trial judge told the jury that after the defendant had given evidence tending to show that he was insane, the legal presump-

tion of sanity was rebutted and the prosecution was required to prove his sanity by a fair preponderance of the credible evidence, he laid down an improper rule and deprived the defendant of a substantial right. It is true that later on in the charge the jury were told that if they were not satisfied beyond a reasonable doubt that the defendant was sane and responsible for his acts at the time their verdict should be one of acquittal on the ground of insanity, but the previous instruction was not withdrawn, and it still stood as a rule which they might follow. After an incorrect rule had been laid down, followed by the correct rule, but without explanation, the attention of the court was called to the subject by the counsel for the defendant, who said: "I think your honor stated in substance that after the defense had given evidence of insanity, then the burden is upon the People to prove sanity by a fair preponderance of the evidence. I request your honor to charge that the defense having given evidence of insanity, the burden is upon the People to prove sanity beyond a reasonable doubt." The object of this request was to clear up the confusion caused by laying down two discordant rules in relation to the amount of evidence required upon the only issue that was seriously contested, and the defendant was entitled to have the proposition charged either literally or in substance. The court, however, did not so charge, but in reply to the request said: "I charge you that the duty is upon the People to satisfy you as to the sanity of the defendant by a preponderance of the evidence, but in considering that evidence, if you have any reasonable doubt as to the defendant's sanity at the time, he should be acquitted upon the ground of insanity." The defendant excepted and thus raised an error, which, as I think, requires a new trial.

The same confusion as to what rule of evidence applied, which had been created by the body of the charge, was continued by this response to the request to lay down the true legal proposition. The existing doubt was not removed but was confirmed, under circumstances which were calculated to

fasten the attention of the jury upon it, for no other request was made by either party. They could not tell which rule was to guide them, nor whether there was any difference between a preponderance of evidence and proof beyond a reasonable doubt. They may have concluded that if the People had furnished a preponderance of evidence as to sanity, they had no right to entertain a reasonable doubt upon the subject. They were told on the one hand that if the prosecution satisfied them as to the defendant's sanity by a preponderance of evidence, it was sufficient; and on the other, that if they had any reasonable doubt upon the subject, they should acquit. In the same sentence they were given a wrong rule and the right rule and they were free to follow either. If they followed the former, they did the defendant an injustice and how can we tell which they followed? They could not follow the entire instruction because a preponderance is not enough, although the court told them it was. They could only follow the correct part of the proposition by disregarding the incorrect part, and this they were not at liberty to do. The natural result of the entire charge, both the body and in response to the request, was to confound the two rules and lead the jury to believe there was no difference between them. The original error was not cured, but was perpetuated and confirmed by the last utterance of the court to the jury. As, in my judgment, an improper instruction was given and the proper instruction was refused in violation of the defendant's lawful right, I am compelled to vote for reversal and a new trial.

PARKER, Ch. J., O'BRIEN, BARTLETT, HAIGHT and MARTIN, JJ., concur with GRAY, J.; VANN, J., dissents.

Judgment of conviction affirmed.