## PEOPLE v. LONG.

(Supreme Court, Appellate Division, First Department.  May 17, 1912.)

1. RAPE (§ 51*)—PROSECUTION—SUFFICIENCY OF EVIDENCE.
    Evidence in a prosecution for rape *held* to sustain a conviction of rape in the first degree.
    [Ed. Note.—For other cases, see Rape, Cent. Dig. §§ 71–77; Dec. Dig. § 51.*]

2. CRIMINAL LAW (§ 1159*)—APPEAL—CONCLUSIVENESS OF VERDICT—CONFLICT-ING EVIDENCE.
    *A decision upon disputed facts is for the jury, and not for the appel-late court, unless it can see that the judgment was clearly against the evidence.*
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3074–3083; Dec. Dig. § 1159.*]

3. CRIMINAL LAW (§ 1159*)—APPEAL—REVERSAL—SEVERITY OF SENTENCE.
    *The Appellate Division is not authorized to reverse a conviction because of the severity of the sentence.*
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3074–3083; Dec. Dig. § 1159.*]

4. CRIMINAL LAW (§ 1159*)—APPEAL—CONCLUSIVENESS OF VERDICT—REASON-ABLE DOUBT ON EVIDENCE.
    The Appellate Division has no power to interfere with a conviction merely because it entertains a reasonable doubt upon the evidence.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3074–3083; Dec. Dig. § 1159.*]

    McLaughlin and Miller, JJ., dissenting.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Court of General Sessions, New York County.

Andrew Long was convicted of rape in the first degree, and he appeals. Affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, McLAUGHLIN, and MILLER, JJ.

Stanley Holcomb Molleson, of New York City, for appellant.

Charles S. Whitman, Dist. Atty. (Robert C. Taylor, of counsel), for the People.

CLARKE, J. The complainant, Mary Kapalay, 19 years of age, was born at Oraway, in Austria, had little knowledge of English, and was examined through an interpreter. She lived with her parents on a farm, and had never worked for any one else until she came to America. She had never seen a negro until she came to this country. She had been employed by Mrs. Saffer in household work for five months. The family occupied a seven-room apartment located on the first floor above the ground floor in an apartment house. The defendant was a colored elevator boy in the house, whose hours of employment were from 9 a. m. until 7 p. m. On December 5, 1911, Mrs. Saffer had gone out, leaving the complainant alone. She had been gone about an hour, when, about 3 o'clock in the afternoon, the defendant—

"rang the bell. I opened the door, and he came in, and he handed me a letter. * * * He said to me: 'Give me a glass of whisky.' * * * I told him: 'I will not give you. I am afraid.' * * * He said: 'Give it to me.' * * * I went to the kitchen, and I gave it to him. He was in the kitchen. After he drank the whisky, he got hold of my arms, and dragged me into the bedroom. * * * He put a pillow on my face, he took my legs apart, and he done me something terrible that I cannot express before the jury. He uncovered my dress [giving other details]. It was in my bed. I was crying and hollering, begging him for mercy. Q. How long was he on the bed with you? A. About 15 or 20 minutes. He ran away, and I remained at home, and commenced to cry."

Upon cross-examination she testified:

"Q. As soon as you started to cry out, the defendant put the pillow over your head? A. Yes, sir. * * * At the time he drank the whisky, he got hold of me, and he dragged me into the bedroom. * * * He laid me down [on the bed]. When he dragged me in, my head fell down. Then he took the pillow, and covered my face with it. * * * He just got hold of it and put it on my face. * * * I was struggling there at the time, and I removed the pillow from my face.

"Q. How long was the pillow over your face? A. I don't know. I was terribly frightened, and I don't know whether it happened at the time he was on top of me, or afterwards.

"Q. How long were you in the bedroom? A. Between 15 and 20 minutes.

"Q. Was the pillow on your head all this time? A. Yes, sir. * * * I know it was on my mouth about 15 or 20 minutes, I don't know.

"Q. By the Court: Did you say anything to Andrew in the bed, or did he say anything to you? A. I was crying and hollering and begging for help.

"Q. What did you say to him, if anything? A. I told him to go to hell. * * *

"Q. By the Court: After Andrew left your room, did you phone for him to come back? A. When he left me in the room, I was crying, and I said: 'You open the elevator, and I will go down and wait until my mistress comes, and I will tell her what happened to me.'"

Her mistress testified that she returned at about 4 o'clock that day, and that about five minutes afterwards the complainant told her about the assault by the defendant upon her.

A physician testified that he examined the complainant on December 10th; that he found black and blue marks on the inner parts of the skin of both thighs, deep down; that they looked like finger marks; there were various spots all over; it was not one big, large discoloration; that these many black and blue marks of discoloration on both thighs indicated violence. He further testified in detail to a condition of ruptured and freshly torn hymen, which indicated recent sexual intercourse.

The defendant admitted on the stand that he had sexual intercourse with complainant at the time and place testified to. He admitted it to the officer who arrested him, who testified:

"I asked him then if she had not resisted him in any way, or put up any kick; and he said, 'Well, a little, not very much.'"

Another officer testified that the defendant said to him:

"* * * She kicked, and held her two hands in this position (indicating). * * *"

The defendant testified that he had a conversation with complainant's mistress in complainant's presence.

"Q. What did she say to you, and what did you say to her? A. She asked me what did I do to the girl. I told her I hadn't done anything. She said: 'The girl said you dragged her in the bedroom, and put a pillow over her face.' And I told her I didn't do it. Q. In fact, you told Mrs. Saffer you had not had anything to do with the girl, didn't you? A. I did."

The defense was an admission of the intercourse, a denial of the force, and claim of consent and acquiescence. A clear question of fact was presented. It is not contended that the court would have been authorized to have directed a verdict of acquittal. There are no errors pointed out in the opinion of Mr. Justice McLAUGHLIN requiring a reversal. This court is to reverse because there was evidence from which it might be inferred that there had been consent or failure to exercise the degree of resistance required by law.

[1] There was such evidence if the defendant's story should be taken as true in its entirety. But, as I read the case, there was sufficient evidence of force, lack of consent, resistance, and prompt complaint to sustain the verdict.

[2] That being so, the decision upon disputed facts was for the jury, and not for this court, unless we can see that the judgment was clearly against the evidence. The defendant had a fair trial, so we cannot say that justice requires a new trial.

[3] Nor are we authorized to reverse because of the severity of the sentence.

[4] This court has no power to interfere with the judgment merely because it may entertain a reasonable doubt upon the evidence. The determination of that question is within the province of the jury. In People v. Taylor, 138 N. Y. 398, 406, 34 N. E. 275, 278, the court said:

"If, in the judgment of this court, there was a rational doubt of the guilt of the defendant, it would not be a sufficient ground for reversal. Under our

system of criminal jurisprudence, it becomes the exclusive province of the jury to determine whether the evidence pointing to the guilt of the accused is so lacking in convincing force as to leave an intelligent and discriminating mind in doubt as to the truth of the charge contained in the indictment. When the jury by their verdict have declared that no such condition of mental uncertainty has arisen from a contemplation of the evidence, the prisoner has had the full benefit of the rule of law which protects him from punishment, unless his crime is established beyond a reasonable doubt, and the question is not open for review in this court, unless the case is so weak that the verdict should be set aside because against the weight of evidence, or for other sufficient cause."

In People v. Shea, 147 N. Y. 78, 98, 41 N. E. 505, 511, Judge Peckham said:

"We are now asked to set that verdict aside upon the merits and to grant a new trial because justice requires it. We cannot do it. We are entirely satisfied that the jury have arrived at a just conclusion, although if we had a rational doubt on that subject, there being at the least a conflict in the evidence from which different inferences might be drawn, we should not feel at liberty to reverse the finding of the jury when such finding is not clearly against the weight of evidence, and does not appear to have been influenced by any improper considerations. People v. Taylor, 138 N. Y. 398 [34 N. E. 275]. In People v. Egnor, 175 N. Y. 419, 425 [67 N. E. 906, 907], Judge Gray said: 'The issue was for them (the jury) to decide and this court should not invade their province and interfere with their decision, because of doubts entertained upon the evidence.'"

In People v. Rodawald, 177 N. Y. 408, 420, 70 N. E. 1, 5, Judge Vann said:

"If a reasonable doubt existed as to the defendant's guilt, or as to the degree of his guilt, it was for the jury to find it. Even if we should reach a different conclusion, we must accept their verdict as rendered, for the Constitution and the law makes their judgment supreme under such circumstances. People v. Kelly, 113 N. Y. 647 [21 N. E. 122]; People v. Hoch, 150 N. Y. 291 [44 N. E. 976]."

The trial court charged:

"It is only proper for me to remind the jury that the Court of Appeals has often called attention in cases of this kind to the necessity of admonishing the jury to be concerned only with the law and the facts in the case to steel their minds against any prejudice against a defendant. * * * It is of great importance that justice be done, but justice should be administered in such a way as not to reflect any discredit on the state; and all elements of passion or prejudice should be so far eliminated that there can be no question of the wisdom of your judgment and the propriety of it. * * * Now, as to the question of consent, that is a question of fact for the jury to determine, whether or not she consented. If she consented to this act of intercourse there was no crime."

He proceeded to read from People v. Clemens, 3 N. Y. Cr. R. 568, People v. Bowles, 3 N. Y. Cr. R. 447, People v. Dohring, 59 N. Y. 386, 17 Am. Rep. 349, and People v. Connor, 126 N. Y. 278, 27 N. E. 252, thus charging fully and completely as to the duty of resistance and the extent of such resistance required of the complainant.

There was no reversible error committed upon this trial. It was conducted fairly. The defendant had the benefit of all the rules of law instituted for his protection. Upon conflicting evidence the jury rejected his story, as was their right, and resolved that he was guilty

of the crime charged beyond a reasonable doubt. This court is not charged with the duty of resolving that question. The verdict, in my opinion, was not against the weight of evidence, and justice does not require a new trial.

The judgment should be affirmed.

INGRAHAM, P. J., and LAUGHLIN, J., concur.

McLAUGHLIN, J. (dissenting). The defendant appeals from a judgment of the Court of General Sessions of the city of New York, convicting him of the crime of rape in the first degree, for which he was sentenced to imprisonment in a state's prison for a term of not less than 10 years nor more than 19 years and 6 months.

He admits that he had intercourse with the complaining witness at the time stated in the indictment, but alleges that it was with her consent. The complaining witness was at the time between 19 and 20 years of age, and engaged as a domestic in an apartment in a large building; there being several similar apartments on the same floor. The defendant was what is termed in the record an "elevator boy," engaged in operating one of the elevators. The record fails to disclose his age, but it may be inferred from a statement made by him at the time he was arraigned and pleaded to the indictment that he was somewhat younger. The complaining witness testified that between 3 and 4 o'clock on the afternoon of December 5, 1911, while she was alone in the apartment, the bell to the front door rang, which she answered, and, on opening the door, she saw the defendant; that she took the chain off the door, and he came into the hall, gave her a letter, and asked her for a drink of whisky; that she thereupon took him to the kitchen, and gave him a glass of it; that, after he drank it, he forcibly took her onto a bed in an adjoining bedroom, and ravished her. She admitted on cross-examination that for three or four months previously she had sustained very intimate relations with the defendant; that he had frequently hugged, kissed, and "wrestled" with her; that on four or five previous occasions while she was alone she had permitted him to enter the apartment, on two of which she had given him whisky, and on each of which he was in her room and in her bed. Her own language is: "He was in my room. He was laying in my bed about five times, but he didn't do me anything."

Her testimony that on the occasion in question he used force and she resisted is not corroborated in any respect. She did not state that she attempted to make any outcry in going from the kitchen to the bedroom, nor even then, until they were on the bed; and, when asked what she then said to him, answered, "I told him to go to hell." She further stated that after he had accomplished his purpose and started to leave, "I called him back, and said, "I ain't going to tell this to my mistress' "; but she subsequently qualified this statement by saying that she told him she would tell her mistress, which she did soon after her return.

It is urged by the learned district attorney that there is some cor-

roboration as to the resort to force in the testimony of a physician to the effect that he had examined the complaining witness within five or six days after the occurrence, and discovered "black and blue marks on the skin of both thighs, on the inner parts." But there was nothing to connect such marks with any act of the defendant, the complaining witness not even mentioning them or claiming that she was injured by the defendant where they appeared.

The defendant, as already indicated, strenuously denied that he had resorted to force, or had had intercourse with the complaining witness against her will. He made no attempt to escape, and, when arrested, frankly admitted that the intercourse had taken place. While it may be true that there was a question of fact for the jury, nevertheless, I am of the opinion that, when all the testimony is considered, there is so much doubt about the defendant's guilt that the conviction ought not to be permitted to stand, but justice requires a new trial should be ordered. Section 527, Code of Criminal Procedure. Sir Matthew Hale's statement in regard to the crime of rape has frequently been approved by the courts. He said:

"It must be remembered that it is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, though never so innocent." 1 Hale P. C. 635.

The statement is peculiarly applicable here, since the complaining witness is white and the defendant colored.

The judgment of conviction should therefore be reversed, and a new trial ordered.

MILLER, J., concurs.