THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* NAT SMILEN, Appellant.

First Department, June 4, 1943.

*James D. C. Murray* of counsel (*Daniel Kirchman, Jacob J. Rosenblum* and *Benjamin Mintz* with him on the brief), for appellant.

*Whitman Knapp* of counsel (*Frank S. Hogan, District Attorney*), for respondent.

GLENNON, J. The defendant was convicted in the Court of Special Sessions, New York County, of the crime of perjury in the second degree and was sentenced to a term of imprisonment of one year and fined the sum of $500. The information, which is referred to in the record as an indictment, was filed in the office of the clerk of the Court of Special Sessions in the month of December, 1939. It was filed pursuant to the direction of the Grand Jury and an order theretofore made in the Court of General Sessions of the County of New York. It charged in substance that the defendant willfully and corruptly testified falsely before the Second Additional Grand Jury of the County of New York on the 19th and 21st days of December, 1939, that he had never stated at any time, in words or in substance, that he had paid money, directly or indirectly, to Nick Elia or union officials, gangsters, racketeers or to any persons for or on their behalf for the protection of his business against union activities or for the personal benefit of Nick Elia, whereas in truth and in fact, he had stated to " divers Individuals " that he had paid money to Nick Elia for the personal benefit of Nick Elia and that he had paid money to Nick Elia, union officials, gangsters, racketeers or other persons for or on their behalf for the protection of his business.

According to the record, the defendant was born in Roumania on December 1, 1902. He was brought to America at the age of ten. In his early years he lived in what is described in the record as a slum area in the lower east side of the city of New York. He attended public school until nearly sixteen when he went to work in a factory. He continued going to school at night until he completed the elementary grades. In 1923 he became a naturalized citizen. He and his brother Morris in 1925 decided to go into the fruit and vegetable business. They opened a small store and adopted the name of Smilen Brothers in lieu of Smilowitz, the family name. Over the years they made considerable progress in business, so much so that, at the time this case came on for trial, Smilen Brothers, Inc., of which the defendant was president, operated a chain of twenty-three stores and was doing a gross business of approximately $3,000,000 annually. In connection with its business, Smilen Brothers, Inc., operated a number of trucks for the purpose of transporting the produce in the city of New York and the outlying districts wherein its stores were located.

While the defendant was arraigned on a bench warrant on December 22, 1939, and admitted to bail, the case did not proceed to trial until January 28, 1942. After the defendant was

convicted, he made an application for a certificate of reasonable doubt at Special Term, New York County. Mr. Justice EDER, who presided, granted the application in a well-reasoned and sound opinion in which he reviewed the facts and the law pertaining thereto.

The District Attorney of New York County in 1938 began an investigation of the activities of gangsters, racketeers and union officials who were extorting money from numerous merchants in the retail fruit and vegetable fields. In connection with the investigation, the defendant was requested to appear at the District Attorney's office. He was interrogated on numerous occasions. In the fall of that year, the defendant voluntarily delivered to the District Attorney the books of account of Smilen Brothers, Inc., his personal books of account and all other books, papers and records relating to his personal affairs and to the affairs of Smilen Brothers, Inc.

On November 9, 1939, the Second Additional Grand Jury for the County of New York commenced its investigation. On the 30th of that month, the Grand Jury handed down an indictment accusing Nick Elia, George Hurwitz and others of the crimes of extortion and conspiracy. Elia was tried and convicted with others, and as a result he was sentenced to State prison for a term of from fifteen to thirty years. Hurwitz pleaded guilty and testified for the People and received a suspended sentence. One Sadowsky, a former union official, was not indicted but appeared as a witness against Elia.

After the indictment was presented on November 30, 1939, the Grand Jury continued its investigation. The defendant appeared as a witness before that body. On December 19, 1939, he was examined at some length and was directed to return on the twenty-first of the month. On December 22, 1939, the present charges, as we have seen, were filed in the Court of Special Sessions. The defendant denied that he ever paid any money to Elia. He adhered to that statement at all times. The following excerpts from the record show what happened during the course of the testimony of the defendant which was taken before the Grand Jury on December 19, 1939: " Q. Did you ever give any money to anybody to give to Nick Elia? A. Not to the best of my knowledge. Q. And your answer to all these questions is no, as I understand it? A. To the best of my knowledge, no. Q. Did you ever give any money to Nick Elia for the purpose of protecting you against Local 202? A. Not to the best of my knowledge. Q. Oh, you must answer that yes or no. I want you to think a minute before you do. A. Not to

the best of my knowledge. Q. (The last two questions read by the stenographer.) A. No, to the best of my knowledge. Q. I don't want the best of your knowledge. I want an answer of yes or no. You know whether or not you paid the man for the purpose of protecting you against Local 202. Now, tell us whether you did or didn't? A. I didn't. Q. What is your answer now to that, yes or no? A. No, to the best of my knowledge. Mr. Gurfein: I would like to ask the foreman to direct the witness to answer that question yes or no. The Foreman: Mr. Witness, I don't believe that question requires any special elaborate answer. It is a question which you can very readily answer yes or no to, and it doesn't have to be qualified. Answer the question by saying either yes or no. The Witness: The only reason that I am saying that is because I want to stand on my legal rights. I don't want to put myself in a position where I am going to be framed, because that is what these fellows have been doing for the past year and a half; they have just been bringing us down here and keeping us from our business. I am only asking for my legal rights. I only want to have that justice that is only fair. The Foreman: As foreman of this jury let me assure you now that is what you will get here, is justice, with any answer you give here. All we want are the facts and we are not going to distort the facts. We are the final judges of what shall be done with what you say before this jury and that question is one which can be answered yes or no and to give you full justice is why we are trying to get an unequivocal answer. You say yes or no. The Witness: My answer is no.''

After the foreman of the Grand Jury had directed the witness to answer " yes " or " no," the examination proceeded. For the most part, the witness reiterated what he had already stated. He denied, in effect, to the best of his knowledge that he had ever told anybody " in the world " that Nick Elia was on his payroll. He testified as follows: " Q. Did you ever tell anybody that you had paid money to Nick Elia? A. Not to the best of my knowledge. Q. I now ask you again to answer that question. A. I can't answer that. How can I answer? How can I answer such a question? Q. You now say that you might have. A. I don't know. I mean I sometimes might meet him getting in the car. How can I answer such a thing. To the best of my knowledge, no. Q. That is your best recollection? A. That is my best recollection. I only want what is fair. Don't try to pin me down and try to pin something on me. Q. You want to tell us now, Mr. Smilen, to your knowledge you never told any-

body in the world that you ever paid any money to Nick Elia?
A. That's my best knowledge, yes. Q. And that is without reservation as to any person in the world, is that correct? A. I can't say that. Q. Well, now, if you know of any exception will you please tell us? A. I don't know of anything like that. Q. Did you ever tell anybody in the world that Nick Elia was on your payroll? A. Not to the best of my knowledge. Q. Did you ever tell anybody in the world that Nick Elia was on your payroll, or the payroll of Smilen Brothers, Inc., for the purpose of protecting you against 202? A. Not to my knowledge.''

On his recall as a witness on December 21, 1939, he testified as follows: '' Q. I will now ask you more specifically, Mr. Smilen, to listen very carefully to what I ask you. Did you at the time you had a conference with Sadowsky, Al. Sadowsky and George Hurwitz, concerning unionization of your plant by the United Retail Clerks Union, say to them that you knew Nick and Frank and that they had been on your payroll for protecting you against Local 202 of the Teamsters? A. No. Q. Did you say to Hurwitz and Sadowsky at that time that you had done business with Nick and Frank. A. No. Q. Did you say to Sadowsky and Hurwitz at that time that Nick and Frank were on your payroll? A. No. Q. Did you say at that time to Nick and Frank —to Sadowsky and Hurwitz, that Nick and Frank were on the payroll of Smilen Brothers, Inc? A. No. Q. Did you ever tell Hurwitz and Sadowsky that Nick and Frank were on your payroll? A. No. Q. Did you ever tell Sadowsky and Hurwitz that Nick and Frank were on the payroll of Smilen Brothers, Inc.? A. No. Q. Did you ever tell Hurwitz and Sadowsky that Nick and Frank were protecting your firm against Local 202 of the truckmens' union? A. No. Q. If there is anything that you recall telling Sadowsky and Hurwitz or either of them, concerning Nick and Frank, will you please tell the jury now what that was? A. I can't see why I had any reason to say anything like that.''

In an attempt to prove the perjury on the part of the defendant, the People first called Hurwitz who, it will be remembered, pleaded guilty to the indictment in which he was named with Elia and others, was sentenced to a term of fifteen to thirty years, but sentence was suspended. He had testified for the People in that case. In addition thereto, he admitted that he had been convicted in Bronx County in 1935 in the Court of Special Sessions for the crime of coercion and conspiracy. In 1937 he was again convicted in the county of Queens of the crime of assault and was sentenced to the peni-

tentiary. He testified that he first met the defendant in the spring of 1935. A conference was held concerning the unionization of the men employed by Smilen Brothers, Inc. He testified that at the conference the following conversation took place: "He says to me and Sadowsky, 'Look, what's the sense of pressing me.' He says, 'I could straighten this all out. I know whose behind you.' I don't know whether myself or Sadowsky, we asked what he meant. He said, 'I know Nick and Frank are behind you and I want to straighten it out with them, they are very good friends of mine and have been for a year or so.' We asked him what he meant. He said, 'You see, my trucks have been checked out of 202. That's due to my friends Nick and Frank, but those two people, don't worry about that, I will straighten it out with them.' "

Over two years later, in the summer of 1937, according to Hurwitz, he had another conversation with the defendant. In reference to what the defendant said at that time, he testified as follows: "He said, 'I am paying off; I am giving money,' words to that effect, I can't say exactly the words he said. He said, 'I am going to see Nick tonight and straighten it out once for all.' " This witness further testified that he was a close friend of Elia and Sadowsky; that he and Sadowsky took orders from Elia; that they had worked together in the formation of a union known as 1204. Hurwitz held no position of any kind in the union except that he was a partner. He was asked the following question: "Your partnership consisted in getting as much money out of the union as you could?" To which he replied: "That's right." He admitted that large sums of money were obtained from various employers by extortion or threats.

Albert Sadowsky, although not convicted of a crime insofar as the record discloses, was a close friend of both Elia and Hurwitz. He co-operated with them in their union activities He admitted that he associated with Elia almost every day and, further, that Elia received a considerable sum of money from the union's treasury but that the books of the union were silent as to the payments. In this connection the record discloses the following testimony of this witness: "Q. And you falsified the books, didn't you? A. I wouldn't say falsified. Q. At least you concealed in the corporate books the real payment of the money and the purposes to which it went, didn't you? A. I wouldn't say I hid anything off of it." Further, he was asked if he did not hide the name of Nick Elia from the members of the union. To this question he replied: "If they ever asked

me I would have told. * * * I never volunteered.'' Sadowsky admitted that he was accused of withholding certain money which Smilen Brothers, Inc., had turned over to him to pay to certain members of the union, who were employees of that firm, for overtime, and furthermore, that shortly thereafter he was asked to resign from the union. He testified on direct examination that he thought there were two conferences had with the defendant. One was held late in 1934 and the other early in 1935. The purpose of the conversations, according to him, was to compel the defendant to unionize Smilen Brothers, Inc. At the first conversation, he quoted the defendant as saying: '' ' I know who is behind you boys,' he said, ' Nick and Frank. Why don't you fellows leave me alone? I am a regular fellow. I have done business with them before and I know they are behind me. Why don't you leave me alone? ' '' The second conference he said, he thought took place in 1935. That conference pertained to the attempts on the part of Hurwitz and Sadowsky to organize defendant's place of business. More than two years later, '' probably about June '' of 1937 at a place which Sadowsky could not fix, he testified that the following conversation took place between him and the defendant: '' He said, ' Why don't you fellows leave me alone; * * * what's the matter with you.' I said, ' We are not picking, Nat, get that idea out of your head,' and he said, ' I don't know what's the matter; what's the sense of paying Nick and Frank all that money if I am going to have that trouble with you. I am going down tonight to straighten this out one way or the other.' '' He testified that at a cafe, apparently that same evening, there were present Elia, Frank Persico and George Hurwitz, together with himself. While there, the defendant came in. He testified that Elia and Frank Persico went to a different table with the defendant and after some conversation, Elia returned and stated: '' Why don't you lay off him? Leave him alone; we'll get along fine.''

It might be noted that while Hurwitz and Sadowsky had a great deal of difficulty in fixing the times and places of the alleged admissions on the part of the defendant, still they seem to have been in accord with the main idea, to wit, that the defendant had admitted to them that he had paid money over to Elia. Only the names of Hurwitz and Sadowsky were mentioned before the Grand Jury in 1939 with reference to the so-called admissions of payments by the defendant to Elia. The defendant was asked if he had made a similar statement to any one else '' in the world.'' This the defendant denied.

The People produced one Jacob Horn, a member of the Bar. He testified that he represented the Kings County Fruit and Products Merchants, Inc., an association of retail fruit and vegetable dealers of Kings County. This witness first met the defendant about May or June, 1937. He said, in effect, that the defendant told him that his trucks had been stopped for about an hour in the market on the previous morning and that he was going to a certain trucking office in the market where, he had been advised, he might be able to straighten out his difficulties. The next day this witness again saw the defendant. He testified that at this meeting the defendant informed him that he had gone to the trucking office where he saw certain individuals with whom he had done business before. He was asked what was said, if anything, about the defendant's relations with these individuals previously. To this question Horn replied: " It was only a question of business. He done business with them previously. He had them on the payroll many times." He was asked if any amounts were mentioned and he answered in the negative. He quoted the defendant as saying that it was unnecessary for him to join the association. Horn then testified that he was called to the District Attorney's office sometime in 1940; that he told two of the assistants of the alleged talk he had with the defendant. He asserted that the sole purpose for which he was asked to appear pertained only to what he knew about the defendant.

Between 1937 and the time he appeared at the District Attorney's office in 1940, Jacob Horn testified he never told anybody about the alleged statement of the defendant — " To nobody alive." He testified that he was at the office of the District Attorney seven times in relation to the Smilen matter before he made the statement about the so-called admission on the part of the defendant. It might be remarked that the record shows that it became necessary to admonish this witness, although he was a member of the Bar, during his cross-examination. The justice presiding at the trial finally said: " I am going to have to admonish you again. I am not going to keep on warning you. You are a member of the Bar and you know what the requirements are in Court; at least you should know. There must be formal and orderly procedure." This witness's name was not mentioned in any of the questions addressed to the defendant during his examination before the Grand Jury in November, 1939. It seems passing strange to believe that this witness was telling the truth as to the so-called admissions. He was not unearthed for a number of months after the informa-

tion against this defendant had been filed pursuant to the direction of the Grand Jury. When we consider the denials of the defendant, together with his evidence of good character, we have reached the conclusion that this witness's testimony was highly incredible.

A consideration of the record in this case must lead one to the conclusion that there was, at least, a reasonable doubt as to the guilt of the defendant. Under the circumstances, the judgment should be reversed, the information dismissed, and the fine remitted.

MARTIN, P. J. (dissenting). The defendant has been convicted of the crime of perjury in the second degree. The charge against him grew out of his attempt to shield one Nick Elia in the investigation by the Grand Jury into Elia's activities as a labor racketeer. Elia has been convicted of extortion and conspiracy. (*People* v. *Elia,* 262 App. Div. 836.)

Before the Grand Jury, the defendant testified positively and unequivocally that he never told anyone that Elia was on the payroll of defendant or that of defendant's corporation. He reiterated that testimony on the trial herein.

In support of the charge against the defendant, the People produced George Hurwitz and Albert Sadowsky, organizers of unions, who sought in the years 1934 and 1935 to arrange a labor contract with the defendant and who in 1937 succeeded in having defendant sign a contract with their union. In 1935, according to the testimony of Hurwitz and Sadowsky, defendant relied on Nick Elia and another to relieve him of the necessity of signing with the union represented by Hurwitz and Sadowsky. They testified that in 1937 defendant signed with the union they then represented after conference with Elia. Difficulties developed out of this contract which Hurwitz attempted to adjust with defendant. Hurwitz testified that during one conversation concerning these difficulties, defendant said to him: "What are you worried about? * * * I will speak to Nick and I will take care of the whole thing. Don't worry your head about it."

About two weeks later Hurwitz and Sadowsky had a conference with defendant. Hurwitz's version of this is: "Q. Will you state, please, what was said at that time? A. He said to us, 'Why don't you boys lay off; why do you keep pressing me and why keep annoying the men?' I said, 'I spoke to you a few weeks back and you told me you were going to straighten it out with Nick and Nick didn't tell me nothing.' He said 'What do you think I am paying him for? I am going to be downtown tonight in Mulberry Street and I am going to straighten all that out.' With that we left." Sadowsky testified as to this con-

ference: " Q. And what was the conversation? A. He said, ' Why don't you fellows leave me alone; why are you picking on me for; I don't know what's the matter with you.' I said, ' We are not picking, Nat, get that idea out of your head,' and he said, ' I don't know what's the matter; what's the sense of paying Nick and Frank all that money if I am going to have that trouble with you. I am going down tonight to straighten this out one way or the other.''

Both testified that that night the group met in the cafe indicated and Elia and defendant conferred apart from the others after which Elia instructed Hurwitz and Sadowsky that they were to leave defendant alone and not annoy him.

Jacob Horn, called by the People, testified that in 1937 he represented the Kings County Fruit and Products Merchants, Inc., and sought to persuade defendant to join that organization; that defendant declined to join because of an incident which demonstrated to him that he would be protected by Elia and his associates with whom, defendant stated to Horn, he had done business before and that he had them on the payroll many times. Horn further testified that later in the year at the office of the union he found Elia seated behind a desk and the defendant sitting alongside of him.

Hurwitz was convicted on three occasions, once in the Court of Special Sessions of the City of New York, County of Bronx, for the crime of coercion and conspiracy; a second time in the Court of Special Sessions of the City of New York, County of Queens, for the crime of assault. The third conviction in the Court of General Sessions of the County of New York was for the crime of extortion and coercion. Sadowsky has no criminal record, but the character of his associates and questionable conduct in union activities are developed in the record herein. In the appellant's brief Horn is described as a truculent member of the Bar and it is said: " The motive which prompted Horn to falsify is not so clear, but it is very evident that his disposition towards the defendant was far from friendly.''

The credibility of these witnesses was for the trial court to pass upon. The trial of this defendant developed simply an issue of fact as to his honesty before the Grand Jury.

As was said in *People* v. *Lytton* (257 N. Y. 310, 314): " Inconsistencies and uncertainties are not lacking altogether. They are not so vital as to condemn the verdict. A question of fact remains, involving an appraisal by a jury of the credibility of witnesses, and incapable of satisfactory solution by the study of the printed page (*People* v. *Rodawald,* 177 N. Y. 408, 419,

420; *People* v. *Taylor,* 138 N. Y. 398; *People* v. *Egnor,* 175 N. Y. 419, 425). ' There can be no reversal of the judgment without breaking down the barriers that separate the functions of a jury from those of an appellate court ' (*People* v. *Arata,* 255 N. Y. 374, 375)."

In *People* v. *Atlas* (183 App. Div. 595, 600, affd. 230 N. Y. 629) it was said: " The rule is well settled that on the review of a conviction in a criminal case where there is any evidence of guilt, the question of reasonable doubt must be left to the jury or trial court, and the verdict or decision on the facts must ordinarily be deemed conclusive and will not be disturbed unless it is perfectly clear that it is against the weight of the evidence. (*People* v. *Long,* 150 App. Div. 500; *People* v. *Seidenshner,* 210 N. Y. 341; *People* v. *Katz,* 154 App. Div. 44; affd. 209 N. Y. 311; *People* v. *Rodawald,* 177 id. 409; *People* v. *Becker,* 215 id. 126.) "

There being here nothing but a question of credibility of witnesses and the record of the conduct of the defendant clearly indicating that he is guilty, the judgment of conviction should be affirmed.

TOWNLEY, UNTERMYER and DORE, JJ., concur with GLENNON, J.; MARTIN, P. J., dissents and votes to affirm, in opinion.

Judgment reversed, the information dismissed, and the fine remitted.