(154 App. Div. 44.)

### PEOPLE v. KATZ.

(Supreme Court, Appellate Division, First Department.  December 20, 1912.)

1. INDICTMENT AND INFORMATION (§ 174*)—ALLEGATIONS AS TO PARTIES—AIDERS AND ABETTORS.

Though an indictment for larceny does not allege that any one·else was concerned in the larceny, or that accused is only charged as aider and abettor, but simply charges that he committed the crime, he may be convicted upon proof that he was an accessory.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 540–543;  Dec. Dig. § 174.*]

2. CRIMINAL LAW (§ 1159*)—APPEAL—CONCLUSIVENESS OF VERDICT.

It is not the duty of the Appellate Division to examine the evidence de novo, to determine whether it would have arrived at the same result as the jury, and it will not reverse because it might have decided differently.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3074–3083;  Dec. Dig. § 1159.*]

3. CRIMINAL LAW (§ 345*)—EVIDENCE—DIFFERENT TRANSACTIONS.

Where accused was charged with larceny by conspiring with others to loan another money upon collateral security of a much greater value than the sum loaned, and to then dispose of the collateral, making it necessary to find a well-known bank or trust company to make the loan, evidence was admissible, by a broker, that defendant solicited him to assist in finding a suitable intermediary to act as the ostensible lender, being admissible to show the nature of the conspiracy and the preparations made to carry it out.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 764, 765, 777;  Dec. Dig. § 345.*]

4. WITNESSES (§ 414*)—EVIDENCE—EXTRAJUDICIAL DECLARATIONS.

Where it is claimed that a witness testified with a motive as to free himself, prompting him to testify falsely, evidence of similar declarations, at a time when such motive did not exist, was admissible, especially where the jury were informed that such evidence could not be considered as proof of such facts, but merely as it bore on the credibility of witness' evidence at the trial.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1287–1288;  Dec. Dig. § 414.*]

5. CRIMINAL LAW (§ 1038*)—APPEAL—OBJECTIONS—PRESENTATION BELOW.

Where the court stated that its reasons for refusing to charge several requests were that they had already been covered, it was counsel's duty to call the court's attention to any particular omitted proposition and request an instruction thereon, and, not having done so, but merely having excepted to the failure to charge each and every request, she cannot complain, on appeal, of failure to give an instruction.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2646;  Dec. Dig. § 1038.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. CRIMINAL LAW (§ 1173*)—INSTRUCTIONS—REFUSAL OF REQUESTS.

Where requested charges were not read in the jury's presence, a refusal to charge any of them could not have been taken by the jury as equivalent to charging the contrary.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3164–3168; Dec. Dig. § 1173.*]

7. CRIMINAL LAW (§ 1173*)—APPEAL—HARMLESS, ERROR—FAILURE TO INSTRUCT.

Failure to instruct that, if the jury believed that the witness testified falsely as to any material fact, they could disregard his entire testimony, if they saw fit, was not reversible error, especially where the jury was specially selected under the statute.

. [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3164–3168; Dec. Dig. § 1173.*]

Laughlin, J., dissenting.

Appeal from Trial Term, New York County.

Charles Katz was convicted of first degree grand larceny, and he appeals. Affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

Morgan J. O'Brien (John F. McIntyre and Samuel S. Koenig, both of New York City, on the brief), for appellant.

Robert C. Taylor, of New York City, for the People.

SCOTT, J. The defendant appeals from a judgment convicting him of grand larceny in the first degree.

[1] The basis of the charge against the defendant, as it developed upon the trial, was the allegation that he conspired with one Clark, described as a curb broker, one Persch, and one Sherwood, the cashier of a stockbrokerage firm, to steal certain stock, the property of one Heinze. The scheme devised to obtain possession of the stock was bold and ingenious, and involved the intervention of the officers of a trust company. It was not charged that defendant actually and physically stole the stock. He was claimed to be what, in former days, would have been termed "an accessory before the fact," but was charged and indicted as a principal under the provisions of section 29 of the Penal Code (now section 2, Penal Law [Consol. Laws 1909, c. 40]). He was indicted alone; Clark, Sherwood, Persch, and Field being separately indicted. Defendant's indictment does not mention any one else as having been concerned in the larceny, and does not explain that defendant is charged with the crime because he aided and abetted others in committing it. It simply charges him, substantially in the words of the statute, with having committed the crime. It is strongly urged that such an indictment is insufficient under the circumstances of the case, and that the indictment should have alleged who is said to have physically committed the crime. The Court of Appeals in People v. Bliven, 112 N. Y. 79, 19 N. E. 638, 8 Am. St. Rep. 701, seems to have entertained a contrary opinion, and it is a well-known fact in the legal history of this state that the same contentions now

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

made by the defendant were vehemently urged upon the Court of Appeals on the motion for a reargument of the appeal from the conviction for murder in People v. Patrick, and were necessarily overruled when the motion for reargument was denied. People v. Patrick, 183 N. Y. 52, 75 N. E. 963. We are of the opinion, therefore, that this objection to the indictment is not well founded.

We have examined and re-examined the record with great care, and with the aid of exhaustive and able briefs on the part both of the people and of the defendant. We do not consider it necessary to recite at length the evidence upon which the jury reached their verdict. To prove the conspiracy and defendant's alleged relation to it, the people were, of course, obliged to rely upon the evidence of persons whose character was no better than that which it was sought to attribute to the defendant himself, including at least two self-confessed participants in the conspiracy. They were, however, for the most part, the defendant's self-chosen associates in other matters, if not in the particular crime charged against him. Their veracity and that of defendant, who contradicted them flatly, was essentially a question for the jury, which, as the record shows, was a special jury drawn from the list authorized by chapter 602, Laws 1901. This special jury list, as the statute requires and as is the fact, is composed of persons specially selected from the general jury list after careful personal examination as to their general intelligence and experience as jurors. We should hesitate long before overturning, on a mere question of veracity, a verdict reached by such a jury, especially when the defendant has been represented, as in this case by counsel of long experience in criminal trials and of unquestioned energy and devotion to his client's cause.

[2] It would be easy to go through this record, as it would in many other cases, and argue, from the evidence as it appears in type, that the jury must have believed some witnesses whom it should not have believed, and disbelieved some whom it should have believed; but it would also be equally easy to pick out corroborative evidence in many places, which, taken in connection with the testimony of the people's witnesses, would fully justify the verdict. It is not our duty to usurp the functions of the jury and to examine the evidence de novo, with a view to determining whether or not, on the same evidence, we should have arrived at the same result as that at which the jury arrived. So long as the verdict is not clearly against the evidence, as we think it is not in this case, and it appears that the defendant has had a fair trial before an impartial judge and an intelligent jury of his own selection, as well as the aid of competent counsel, we cannot feel that it is our duty to reverse the conviction because, perchance, if we had been sitting as jurors, we might have decided differently. People v. Taylor, 138 N. Y. 398, 34 N. E. 275; People v. Shea, 147 N. Y. 78, 41 N. E. 505; People v. Egnor, 175 N. Y. 419, 67 N. E. 906; People v. Rodewald, 177 N. Y. 408, 70 N. E. 1; People v. Long, 150 App. Div. 500, 135 N. Y. Supp. 491, affirmed 206 N. Y. ——, 99 N. E. 1114.

[3] The record bristles with defendant's exceptions, of which nearly 400 were taken during the course of the trial. Comparatively few

of them are now relied upon, and of these some present no question requiring discussion here. Much stress is laid upon the fact that the court admitted evidence to be introduced concerning what is characterized as a different and distinct transaction. The conspiracy charged was that defendant and others had devised a plan to actually loan Heinze a considerable amount of money upon collateral security of a value much larger than the sum loaned, and then to dispose of the collateral. To carry out this scheme it was necessary to find a well-known Stock Exchange house, or a bank or trust company, to "clear the loan," as it was called, or, in other words, to become the ostensible lender, as Heinze was unwilling to intrust his securities to an irresponsible lender. To obtain a firm or corporation to "clear the loan," which would be of sufficient reputation to satisfy Heinze, and at the same time to be sufficiently pliable to deliver the securities to the conspirators, was not the least difficult feature of the scheme. The evidence objected to was that of a broker named Schwede, who testified that defendant solicited him to assist in finding a suitable intermediary. In our opinion the evidence was relevant, as tending to show the nature of the conspiracy upon which the defendant had embarked, and the preparations which he made to carry it out. Evidence of preparation to commit a crime stands upon the same footing as evidence of previous attempts to commit it, and is always relevant. Thus, in murder cases, it has been held relevant to show that the accused redeemed a pawned revolver (People v. Scott, 153 N. Y. 40, 46 N. E. 1028), or practiced shooting at a mark (People v. McGuire, 135 N. Y. 639, 32 N. E. 146;[1] People v. Youngs, 151 N. Y. 210, 45 N. E. 460), or, where the crime was committed by stabbing, ground a knife (People v. Tice, 131 N. Y. 651, 30 N. E. 494, 15 L. R. A. 669). In the present case Schwede's testimony merely tended to show that the defendant had endeavored to find a tool to use in committing the crime.

[4] It is contended that the court erred in admitting in evidence a statement made by one of the witnesses for the people (Clark) to his own counsel prior to the trial. Clark's character and previous history were, as the district attorney frankly stated, none of the best. On his direct examination he had given testimony to establish the defendant's guilt. He was subjected to a prolonged and unusually severe cross-examination, aimed at breaking down his credibility with the jury, and upon the cross-examination the defendant's counsel himself read from and used parts of Clark's previous statement to his own counsel. This statement substantially agreed with the evidence given upon the trial. The evident purpose of the defendant's counsel was to persuade the jury that in giving his evidence upon the trial Clark was actuated by a motive to save himself at the expense of the defendant, and therefore that his evidence was untrustworthy. We are of the opinion that the evidence was properly received. The rule applicable to such a

---

[1] Reported in full in the Northeastern Reporter; reported as a memorandum decision without opinion in the New York Reports.

case is well settled by Matter of Hesdra, 119 N. Y. 615, 23 N. E. 555, and Robb v. Hackley, 23 Wend. 50. It is thus stated:

"Where a witness is charged with giving his testimony under the influence of some motive prompting him to make a false or colored statement, it may be shown that he made similar declarations at a time when the imputed motive did not exist."

The learned trial justice was at great pains to impress upon the jury the fact that Clark's previous statement was not received, and could not be considered, as proof of the facts therein stated, but was to be considered only with reference to its bearing upon the evidence given by Clark at the trial. For the same reason, and under the rule of evidence above quoted, the defendant can take nothing by his exception to the admission of proof of former statements made by the witness Birmingham. Nor was it error to leave it to the jury to determine whether or not the defendant Birmingham was an accomplice. Such submission was, if anything, more rather than less than the defendant was entitled to demand. The court would probably have committed no error if it had held that Birmingham was not an accomplice.

The other exceptions to which we deem it proper to refer relate to those taken, or endeavored to be taken, to the refusals to charge as requested by the defendant. The charge of the trial justice was eminently fair, full, and impartial. The defendant's counsel took many exceptions to its language, in pursuance apparently of a general policy, maintained throughout the trial, to except to everything, but now insists upon only one, and that raises no question necessary to be discussed.

Before the jury was charged, counsel for the defendant handed to the court 102 written requests to charge. It is apparent that the court intended to incorporate into the charge practically all of these, and in fact did so incorporate, either in paraphrase or in the language of the request, nearly every proposition thus submitted. That the court intended to charge all of the proper requests, and believed that they had been covered, is evidenced by what took place at the end of the charge. Referring to the requests, defendant's counsel said:

"May they all go on the record, and may we have an exception to each one?"

To which the court replied:

"Certainly. The counsel have submitted to the court 102 requests to charge, and the court grants an exception to each and every request refused by the court, *on the ground that they are already covered in the charge.*"

It is very doubtful whether exceptions taken in this wholesale fashion raise any question of error. To submit so large a list of requests, and then interpose an omnibus exception, amounts to little else than a trap "better adapted to confuse and trip a court than to serve any useful purpose." People v. McCallam, 3 N. Y. Cr. R. 189–198, affirmed 103 N. Y. 587, 9 N. E. 502.

[5] Counsel had been clearly and distinctly advised by the court that the reason for refusing to repeat and recharge the several propositions embraced in the requests was "that they had already been covered in the charge." If some of the proper requests had been overlooked by

the court, and thus not included in the charge, it was the duty of counsel to have called the attention of the court to the omitted propositions, and ask specifically as to them that the jury be instructed. People v. Birnbaum, 114 App. Div. 480–489, 100 N. Y. Supp. 160. Having failed to take this course, the defendant is not entitled as a matter of right to insist upon his exception; and we are not required, in consequence, to reverse the judgment by reason of the exception, unless we can clearly see that the defendant has been prejudiced. We are satisfied that the defendant has not been prejudiced.

[6] The requests were not read in the presence of the jury, and the refusal to charge any of them cannot have been accepted by the jury as tantamount to charging contrary thereto. People v. Lumsden, 141 App. Div. 158–169, 125 N. Y. Supp. 1079. One of the requests (numbered 72 on the list) was that the jury be charged that:

"The fact that two or more accomplices testify to the commission of a crime does not dispense with the necessity of corroboration, and the same amount of evidence is required to connect the defendant with the crime as if there had been but one accomplice."

The court had already charged fully upon the necessity for corroboration of the admitted accomplices, and, while he had not adopted the words of the request above quoted, he had covered the same idea in language which an intelligent jury could hardly have failed to understand. If counsel desired a more ample charge on this subject, he should have clearly indicated his desire by calling attention specifically to his request.

[7] The other omissions to which our attention is called are those relating to the requests numbered 74 and 93, in which the court was requested to charge as to certain witnesses that:

"If the jury believe that the witness willfully testified falsely as to any material fact, they are at liberty to disregard the entire testimony of the witness if they see fit."

This request is not covered by the main charge; but it is entirely certain that if counsel had been more explicit with the court, and had directed its attention to the omission to charge as requested in this particular, the court would have instantly supplied the omission, probably stating the rule as it should be stated—that the jury under such circumstances might, but need not, reject the whole testimony of the witness. We do not consider that the omission of this particular charge constitutes reversible error. The proposition embraced in the request is scarcely a rule of law, although its propriety has been affirmed in many cases. It is rather the statement of a rule by which the weight of evidence is to be tested—a rule derived from the experience of mankind, both lay and legal. A jury, carefully selected for their intelligence and experience, as this jury was, would undoubtedly apply this rule in considering how far a witness was to be believed, even without a reference to the rule by the court.

We are satisfied that the conviction was without legal error, and was justified by the evidence.

The judgment is therefore affirmed.

INGRAHAM, P. J., and CLARKE and MILLER, JJ., concur.

LAUGHLIN, J. (dissenting). The defendant was indicted on three counts. The first count charges that on or about the 2d day of August, 1909, he stole with force and arms from one Joyce 46 certificates, for 100 shares each, of the capital stock of the Davis-Daly Copper Company, of the par value of $15 per share, and worth $7.25 per share, and 156 certificates, for 100 shares each, of the capital stock of the Ohio Copper Company, of the par value of $10 per share, and of the value of $5 per share. The second count charges that the stealing was as agent, bailee, and trustee; and the third count is for receiving the certificates of stock as stolen goods. None of the counts was formally withdrawn from the jury; but the case was submitted on the first count, and the charge of the court made no reference to the other two counts.

In opening the case the assistant district attorney did not charge that the defendant actually stole the certificates of stock, or that he *directly* participated in the stealing. He stated that the evidence in behalf of the people would show that the defendant conspired with one Clark, a curb broker, and one Persch, who officed with him, and one Sherwood, a cashier for the stock brokerage firm of Leonard J. Field & Co.; Clark, Persch, and Sherwood being the principal actors in the conspiracy. No evidence was offered tending to show that the defendant directly participated in obtaining the stock from the owner, and the court instructed the jury that the people did not claim that the defendant actually stole the stock, but merely that he was liable under the law as a principal, on the theory that he aided and abetted others in the commission of the crime. The defendant was indicted alone. The indictment contains no reference to any one else as having participated in the commission of the crime, and it does not charge the defendant with having aided or abetted in the commission of the crime. Clark, Persch, Sherwood, and Field were separately indicted for stealing these certificates of stock. Clark became a witness for the people and was promised immunity. Persch was tried, and the jury disagreed. The district attorney dismissed the indictment against Sherwood. Leonard J. Field was also indicted for perjury, presumably in testifying before the grand jury, and that indictment was also dismissed by the district attorney.

All evidence tending to show that the defendant aided and abetted in the commission of the crime, or conspired with others to commit it, was received over objections duly made in behalf of the defendant on the ground that he was not indicted jointly with another or others, and that the indictment only charged him as a principal. The learned counsel for the appellant contends that the only effect of section 29 of the Penal Code, now section 2 of the Penal Law, which defines a principal as "a person concerned in the commission of a crime, whether he directly commits the act constituting the offense or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime," was to change the former requirement of the law that an accessory before the fact should be indicted and prosecuted as such, and to enable the people to prosecute him as a principal, and that

it does not relieve the people from alleging in the indictment, particularly where the defendant is indicted alone, who *actually* committed the crime, and charging him with having aided or abetted in its commission. In support of this contention it is further argued that, unless this be so, the indictment does not charge the *acts* constituting the crime as required by section 275 of the Code of Criminal Procedure, and there would be nothing to prevent a second indictment; and numerous authorities are cited in support of this argument. See People v. Peckens, 153 N. Y. 576, 47 N. E. 883; People v. Willis, 158 N. Y. 392–396, 53 N. E. 29; People v. Seldner, 62 App. Div. 357, 71 N. Y. Supp. 35; People v. Kane, 161 N. Y. 386, 55 N. E. 946; People v. Albow, 140 N. Y. 130–134, 35 N. E. 438; People v. Helmer, 154 N. Y. 595–600, 49 N. E. 249; People v. Corbalis, 178 N. Y. 516, 71 N. E. 106; People v. Wolf, 183 N. Y. 464, 76 N. E. 592; People v. McKane, 143 N. Y. 455, 38 N. E. 950.

No bill of particulars is required in a criminal case, and therefore there is force in the contention that a defendant, indicted alone and only charged with having actually and personally committed the crime, may be seriously prejudiced if he can be convicted on evidence that he was at the most remote part of the world from the scene of the crime at the time, and that he induced any one or more of the inhabitants of the globe to commit it. For those reasons we intimated in People v. Seldner, supra, that the indictment in such case should specify the actor and charge the defendant with having aided and abetted him; but since our decision in the Seldner Case this question appears to have been presented to the Court of Appeals by a motion for a reargument in People v. Patrick, the defendant there having been indicted alone as a principal, in that he "gave and administered" poison to Rice, without being charged in the indictment with having aided and abetted in the commission of the murder, and the evidence upon which he was convicted showed merely that he aided and abetted in the commission of the crime, but that the poison was administered by the valet, Jones (People v. Patrick, 182 N. Y. 131, 74 N. E. 843); and the Court of Appeals denied the motion (People v. Patrick, 183 N. Y. 52, 75 N. E. 963). It is possible that that ruling was made upon the theory that the question was not properly presented; but in view of the fact that such objection could not have been obviated, if taken, we are not at liberty to accept that theory, and therefore the decision of the Court of Appeals in the Patrick Case, in the light of the broad views expressed by that court in People v. Bliven, 112 N. Y. 79, 19 N. E. 638, 8 Am. St. Rep. 701, which were, to some extent, obiter, preclude the further consideration of the question by this court.

The case is quite complicated. The salient facts, however, relating to the larceny of these certificates of stock, are not in dispute; but the evidence relating to defendant's connection with it is very conflicting. The defendant was 38 years of age, and the president of the Eastern Brewing Company, and had been president of a brewery for some 12 years. He was born in Paterson, N. J., but at the time in question resided in New York. He had borne an unblemished reputation. His good character was testified to by nine witnesses of prom-

inence and respectability in various walks of life, one of whom was called by the people on another question. Clark, according to his own testimony, was 28 years of age at the time of the trial, and at the age of 18 he had been indicted for forging a check and pleaded guilty, and he admitted on this trial that he was guilty of that crime, and was sentenced to the Elmira Reformatory and served a term therein. He was indicted for this larceny as a second offense, and knew that on conviction he could be imprisoned for 20 years; and about the same time, or shortly thereafter, he was indicted for stealing diamonds of the value of $6,000, and had been promised immunity if he would testify in behalf of the people. He concedes that he deliberately went into a crooked deal with Sherwood and Persch and the defendant to obtain these certificates of stock as security for a loan, with a view to selling them and dividing the proceeds over and above the amount of the loan, and that he induced the owner, one Augustus Heinze, to part with the securities upon the representation that the Windsor Trust Company would make the loan and hold the securities, when he had already planned to obtain possession of and sell the stock, if he could induce the owner to part with the possession thereof, on the theory of pledging the same as security for a loan. Down to the time of the trial, he continued to associate with the defendant, who had furnished his bail, and with Persch, and concealed from them the fact that he intended to testify in behalf of the people against them and obtain freedom for himself. He admitted that he testified on the trial of Persch that he and Persch conceived and discussed the plan to get Heinze's stock, if they could procure a bank to clear the loan, knowing that Sherwood could obtain the money with which to make the loan for them; that he knew Heinze was desirous of obtaining loans, and he thought that he could get the stock, if some bank would clear the loan; that they had tried, by submitting different names, "to get hold of some Heinze stock, but he turned them down, he would not take them"; and that he and Persch took the matter up with defendant, to see if he knew anybody who could get "the bank"; and he admitted on this trial that that testimony was true, and that when they first talked with the defendant the latter said that he could not get a bank, and that then the witness thought of one Eugene Clark, who was connected with a bank in New Jersey, and communicated with him on the subject, and through him opened negotiations with the First National Bank of Perth Amboy, and arranged with that bank to have the money advanced through its agents, the brokerage firm of Keené & Van Cortlandt, of Pine street, New York, and that afterwards this fell through because said brokers refused to give a trust certificate for the stock.

The uncontroverted evidence further shows that in the latter part of July, on an occasion when one Kaufmann, a broker, called at Clark's office, where the defendant had desk room, to see the defendant, Clark and Persch brought the matter to the attention of Kaufmann, in the hope that he might be able to get a bank to clear the loan, and also requested the defendant to speak to Kaufmann with reference thereto,

that Persch and Clark represented to Kaufmann that the Eastern Brewing Company was desirous of making a loan of $50,000 on Heinze stocks, but did not wish to be known to Heinze in the matter, and therefore desired to arrange with some bank to clear the loan; that Kaufmann undertook to endeavor to find a bank, and reported that the Windsor Trust Company would act in the matter; that Clark then went to Heinze, whom he had known since January before, and represented, in substance, that the Windsor Trust Company would make a loan of $50,000 on stocks of a market value of double that sum, but that it would not loan the money to Heinze direct; that Heinze said he would transfer the stock to Joyce, whom Clark met and took to the Windsor Trust Company, and introduced to one Birmingham who was the manager of the bond department, and with whom Kaufmann had had his negotiations; that Clark held himself out to the Windsor Trust Company as the broker for the borrower, and when the loan was consummated received from Joyce $2,000 as a commission, but represented to the defendant and Persch that he received only $1,000, and divided that amount with them; that the plan was to have it appear to the Trust Company that Kaufmann was the broker for the lender, the Eastern Brewing Company, and that Sherwood, who was to and did deliver $50,000, which he obtained from Field & Co., to the Trust Company and was to and did receive the stock and Joyce's note for one year at 6 per cent., represented the lender; that Sherwood was then to sell the stock on the market, and, after reimbursing Field & Co. for the $50,000 advanced by that firm, was to divide 35 per cent. of the surplus between himself and Field, as agreed upon, and was to deliver the remaining 65 per cent. to Persch; that the money was paid over on the 2d day of August, 1909, and stock of the then market value of $109,000 was received by Sherwood, and with the exception of 400 shares, which he delivered to Persch the next day, was sold by Sherwood, the first sale having been made on the 3d and the last on the 6th of August; that Sherwood deposited the proceeds of the sale in his individual bank account, in which prior to that time he had a credit of only from $100 to $200, and, after checking out $50,000 to the order of Field & Co., he drew two checks to the order of Persch, one for $4,070.12, and another for $10,175.30, and had Persch indorse and deliver them back to him, and delivered the one for the larger amount to Field in payment of his share of the commission, and retained the smaller one for his own share of the commission, and thereupon delivered to Persch a check for $30,455.78, being for the balance of the proceeds of the sale of the stock; and that Persch deposited this check to his own credit in the Carnegie Trust Company, and delivered a check for one-third of the amount to Clark.

Persch was not a witness on the trial of this indictment. Clark testified that at the Marquette Club, on the evening of the 6th of August, Persch tendered to the defendant a check for his one-third of the $30,455.78, and the defendant refused to accept it, stating that he wanted his share in cash, and that Persch said, in substance, that he would pay him in cash; that the next morning the defendant and Persch entered their office, and the defendant exhibited a roll of mon-

ey, which he testified positively, on the mere observation of it, without having seen the denomination of any bill, contained at least $10,-000, and said, "I have got mine."

Clark's stenographer, a girl 19 years of age, testified that she was in the office at this time; that the defendant took his pocketbook out of his pocket, but showed no money, and said, "I have mine," or, "I have got mine," and that the day before she had heard the defendant, Clark, and Persch talking about some "deal," and say that "they expected the deal to go through," and that on the morning when the defendant showed his pocketbook she heard them say that it had gone through, and they seemed very happy, but that she did not know what the deal was. No conviction could be allowed to stand on her testimony. It appears that, when she was 17 years of age, she was employed in the office of a wine and liquor dealer, and she sued him, and he settled for $1,000. The nature of the suit is not shown. She testified that her memory of this transaction was quite poor, and that she was not testifying "with any degree of certainty." She afterwards attempted to qualify this by saying that she meant with respect to details. She was subpœnaed by the people, but not sworn, on the trial of Persch. She testified that she did not remember whether Clark, her employer, had asked her to testify against the defendant; that the defendant came to her, and stated in substance that he had heard that she had said that he had made this remark, to which Clark testified on this trial, and had shown the money, or his pocketbook, and said to her that she knew that those statements were not true, and asked how she came to make them, and she admitted that they were not true, and that she did not know how she came to make them, and that she accompanied him to his attorney's office, and, after an interview with the attorney, the latter in her presence dictated a statement to a stenographer, all of which was in every respect as she stated the facts to him, and that she then stated that Kaufmann came to the office and said to defendant, "You know the deal went through," and defendant asked, "What deal?" to which Kaufmann replied, "Why, the Windsor Trust Company," and defendant said, "I do not know what you are talking about," and that she did not at any time hear defendant say, "I have mine," or see him exhibit his pocketbook.

On this trial she said that the things she so stated to defendant's attorney were not true; but she admitted that he interviewed her apart from the defendant, and informed her that he only wanted her to tell the truth. According to her testimony, she refused to sign and swear to the statement, without consulting her uncle, who was an attorney, although at the time she admitted that the statement was in every respect truthful, and that she took it to her uncle, who read it over and advised her not to sign it, but did not ask her whether or not it was true. Her uncle did not claim that he refused to advise her to sign it on the ground of any erroneous statement in it, but said he did so because he desired to shield her from being brought into the matter. According to the testimony of the defendant and his attorney, the latter said to her that he did not wish her to verify the statement in his office, and when informed that she had an uncle, a member of the

bar, advised her to take it to him. It is quite as probable that her statement made to the defendant's attorney was true, as that her evidence given on the trial, which is diametrically opposed thereto, is true; and in view of her failure to deny that her employer had induced her to testify against the defendant, it and other testimony tending to show that he endeavored to induce her to state the things which she denied in her statement to the defendant's attorney, it may well be that she was influenced to corroborate his testimony.

The defendant testified in effect that he knew nothing derogatory to the character of either Persch or Clark, and had been introduced to Persch by the latter's father some time before the transactions in question, and had associated with him more or less; that in the latter part of June Persch said to him that he had an opportunity of obtaining an office with a broker named Clark, whom the defendant had met, who was about to dissolve a partnership, at a rental of $25 a month, which was more than he could afford to pay, and he asked the defendant if he would not take desk room and pay one-half of the rent, and use the office afternoons after finishing his business at the brewery, and said that Clark was a curb broker, and that if the defendant could get them the curb business of a certain firm they would pay him one-third of the commissions, and he accepted the proposition, and undertook to get the business, but was unsuccessful; that he had no knowledge that Persch and Clark were attempting to get these stocks with a view to selling them, and that while he understood that they knew that Heinze was desirous of obtaining loans, and were attempting to negotiate a loan, and expected to share in the commissions, he had no reason to anticipate that there was anything illegal in what they were contemplating; that it was represented to him that he procured a loan of $50,000 on Heinze's stock, and received a commission of 5 per cent., $1,000 of which was paid in cash, and delivered to him by Clark and deposited to his credit, and $800 of which he checked out by their direction to pay commissions which they had promised, viz., Kaufmann $500, and to Ulmann—the collector of the Eastern Brewing Company, who had at the request of Persch two days before signed a collateral note for $50,000, which defendant supposed was to be used in making the loan upon the theory that the Trust Company, which he supposed was making the loan, was not to know the name of the real borrower, whom Ulmann was to represent—$300, and the remaining $200 of which was divided between them after deducting a small amount which Persch and Clark owed him; that it was represented to him that the remaining $1,500 of the commission was paid by the delivery by Heinze, or his representative, of 300 shares of the same kind of stock as that upon which the loan was made, and that they had authorized it to be sold by one Reilly, a curb broker; that he doubted this, and went to Reilly's office, and found that it was true that he had been authorized to, and had, sold 300 shares of that stock, and was ready to pay over the proceeds, and did so by a check to the order of Persch, delivered in the presence of the defendant; that on the receipt of this check Persch said he desired to open an account, and defendant recommended the Carnegie

Trust Company, and offered to accompany Persch there and introduce him; that he and Persch and Clark went there, and Clark stated that he had had trouble with the bank he had been doing business with, and said that he thought that he would also open an account; that they were both introduced by defendant, and opened accounts at the Carnegie Trust Company, Persch depositing this Reilly check, and Clark depositing a check for one-third of that amount, for which Persch gave him a check, and that Persch also gave defendant a check for one-third; that on Friday evening thereafter, at the Marquette Club, Persch tendered him a check for a little over $10,000, and he asked what it was for, and Persch said that it was for commissions, and to ask no questions, but that he insisted upon knowing, and Persch admitted that they had made $30,000 more on this transaction, and he expressed the view that that could not be legitimate, and refused to take the check, and Persch tore it up; that Persch said, that, if he was afraid to take the check, he would draw one to the order of Ulmann, and did so, and delivered it to defendant, who kept it overnight, but was disturbed in mind about it, and early in the morning summoned Persch, and, on getting no further information with respect to the theory upon which such a large amount of profit was made, he tore it up; that he then stated to Persch that he was informed that the Trust Company telephoned to him the day before, and he supposed that it was with reference to opening an account there, concerning which Kaufmann had talked with the officers of the Trust Company, and that he would call there; that on the way down town they were passing the Carnegie Trust Company, and Persch said he wished to draw some money, and they stepped inside, the defendant waiting near the entrance; that he did not see what Persch did (it appears that Persch then cashed a check for $10,000, drawn on his own account, to the order of cash, and dated that day, being the amount which it is claimed, on the testimony of Clark and his stenographer, the defendant a few moments later publicly announced, without even having been asked, that he had received), and that he received no money from him; that before going to the Trust Company he, at Persch's request, no reason being assigned, went to their own office and there met Kaufmann, and requested him to go to the Windsor Trust Company and introduce him, and they went over and met Birmingham, to whom he was introduced by Kaufmann; that Birmingham appeared to be worried over the loan, and seemed to be in doubt as to the defendant's identity, and the defendant stated that he had come with a view to opening an account, but Birmingham said he had requested Kaufmann to bring the defendant there, with a view to ascertaining his (Ulmann's) and the Eastern Brewing Company's connection with the loan, and asked who Ulmann and Sherwood were, and where the stocks were; that defendant informed him that Ulmann was the collector for the brewery and was a reputable man, and that *if* Ulmann had the stocks they were all right, and that Sherwood was not connected with the brewery; that at Birmingham's request they went to the Chatham National Bank, where defendant had an account, and Birmingham was there assured by one of the officers as to who the

defendant was, and that he was a man of means, standing, and respectability; that he criticised Birmingham for not telephoning or ascertaining whether Sherwood was authorized to represent the brewery or Ulmann; that two days later he was summoned to the district attorney's office by a detective, who accompanied him, where he answered all questions put to him, but on the advice of counsel volunteered nothing that was not asked.

The court instructed the jury as matter of law that Sherwood and Clark were accomplices, and that their evidence could not be considered, unless corroborated. Aside from their evidence, and the testimony of Clark's stenographer, to which reference has been made, the only evidence connecting the defendant with the crime is testimony given by Birmingham and by Kaufmann with respect to admissions made by him, and some testimony by Ulmann tending to show that defendant knew that a loan was to be made. One Schwede gave testimony tending to show that defendant, prior to this transaction, contemplated, with Persch, obtaining stock on a loan and selling it, but did not know that it was illegal to do so, provided other stock were obtained when the loan was paid, and abandoned that project, and announced that he did not wish to do anything unlawful, and thereupon Schwede, who was distantly related to him by marriage, introduced defendant to brokers who were his friends and did not deem it necessary to warn them with respect to what he claims defendant proposed, which, however, defendant denied.

No conviction should be allowed to stand on Sherwood's evidence, even though it be corroborated. He admitted that he deliberately willfully committed perjury before the grand jury at the request of Field, in an endeavor to shield Field, and his testimony further shows that he had no regard for honesty in business transactions, and he had a motive in sustaining the position which he took with the district attorney for the purpose of obtaining immunity. No one should be deprived of his liberty on the testimony of such an accomplice. Of course, if the corroborating evidence were sufficient, in itself, to establish the guilt of the defendant, a conviction might stand. The testimony of Birmingham and Kaufmann, concerning interviews with the defendant and admissions made by him, tends to show that he had guilty knowledge of the purpose for which the stocks were obtained, and of the manner in which they were obtained; but the evidence warranted a finding that they also were accomplices, and required a finding that Kaufmann was an accomplice. Birmingham, according to his testimony and that of Joyce, received for the Trust Company $1,000 for undertaking to deceive Joyce and lead him to believe that the loan was being made by the Windsor Trust Company, and that the stocks would be attached to the note and held by the Trust Company, and could be obtained at any time on payment of the amount due on the loan, with interest for the first year, and delivered the note and stock to Sherwood, without ever having seen the defendant, or communicated with his company, or with Ulmann, who it was represented was making the loan, and whose formal proposition in writing, which, however, was wholly unauthorised and a forgery, the Trust Company held, and Birmingham received and

retained personally $250, being one-half of the commissions received by Kaufmann, and he took no receipt for the stock, and made no inquiry as to where it was, until four or five days thereafter, when he was notified by Joyce that some of it was being sold on the curb. Kaufmann prepared the formal application for the loan, first in the name of the Brewing Company, and then, according to his testimony, at the suggestion of the defendant, changed it to the name of Ulmann and presented it to the Trust Company, without consulting Ulmann, and probably signed Ulmann's name, although it does not definitely appear who signed it, and knew that neither the Brewing Company nor Ulmann was making the loan, and that Sherwood was not connected with the Brewing Company, but was represented to the Trust Company as bringing the money from and receiving the stock for the Brewing Company, and he allowed Heinze, whom he knew, to be thus misled, for he understood that the loan was for Heinze. He therefore, on his own testimony, knew that the transaction was not an honest one.

It is probable that the whole truth concerning these matters has not been told. These men must have known that sooner or later it would be discovered that they had sold these stocks. They may have figured, as some of the evidence with respect to another transaction tends to show, that the loan was for a year, and that the market price of the stocks, by selling a large number of shares, would be so depressed that the stocks could be bought in at a lower figure, and that they would thus be able to replace them before the loan fell due. Clark, Persch, and Sherwood, at least, had no particular standing, or large earning capacity, and were without financial resources. Clark and Sherwood admit that they deliberately entered into this scheme, which they knew was unlawful. The position of the defendant, however, was quite different. He had everything to lose, and nothing to gain, by such an unlawful enterprise, and it is extremely doubtful whether he would, with full knowledge of the effect of the transactions—that is to say, with criminal intent—become a party to these transactions. In the opening of this case, the defendant was pictured as the man higher up, who had conceived this unlawful plan, and used Clark and Persch, who were young and inexperienced, as his tools, and it was charged that he was more censurable than they. This record does not sustain that contention. The evidence does not warrant a finding that the defendant conceived this unlawful scheme, and put forward Clark and Persch to consummate it; but, on the contrary, the fair inference is that, if he was a participant in it, he was led into it by them, or one of them. The learned trial justice evidently had grave doubt as to whether the evidence satisfactorily showed the guilt of the defendant beyond a reasonable doubt, for he gave a certificate of reasonable doubt. In these circumstances, and in view of the damaging nature of some of the testimony, and the fact that in most instances the witnesses giving it were impeached by their own testimony on cross-examination, or by other evidence, it became most important for the protection of the rights of the defendant that the jury be fully instructed upon all material points of law that might aid them in determining the facts.

One hundred and two requests to charge, most of which, however,

were very short, only covering from two to four lines of print and containing clear and concise propositions, were handed to the court at the close of the evidence.. At the close of the charge the court announced that the defendant might have an exception to every request not charged "on the ground that they are already covered in the charge," and the defendant's counsel duly excepted separately to the refusal to charge each request. That announcement indicates that the court considered that all of the requests had been charged in substance; but the taking of exceptions indicates that counsel for defendant did not acquiesce in that view, and it is quite clear that no instructions were given to the jury with respect to a great many of the requests. If the guilt of the defendant clearly appeared, errors in refusing to charge as requested in such circumstances might be disregarded, upon the theory that it was the duty of counsel for the defendant to draw the attention of the court to any particular request omitted; but this is not such a case, and, there being serious doubt with respect to the guilt of the defendant, his rights should not be jeopardized, either by errors of omission on the part of the court or of counsel.

The court failed to instruct the jury with respect to the weight to be given to the testimony of witnesses who gave false testimony. One of the requests specifically drew attention to this point, and it was in proper form, and the court was thereby requested to instruct the jury that, if they believed that any witness deliberately and intentionally testified falsely, they might disregard his entire testimony. By another request the court was asked to charge that, if the jury believed that either Clark or Sherwood willfully testified falsely as to any material fact, they were at liberty to disregard the entire testimony of either if they saw fit so to do. The court was also duly requested to make a like charge with respect to the testimony of Clark's stenographer and of her uncle. No instructions were given bearing on these points. It is customary and proper to charge the jury to this effect, where there is a basis therefor in the testimony of any witness, and the case at bar was eminently one in which such instructions should have been given. Laymen, ordinarily, do not understand this proposition, and are often troubled about disregarding particular testimony, although they may believe that the witnesses willfully gave false testimony in part.

On the cross-examination of the defendant he was asked concerning some prior transactions between Persch and himself and a man from Massachusetts, who was known to him by the name of Fiske, but who had several aliases, and he admitted that he received as a result of those transactions a commission of $5,000, and that he was obliged to make up a loss on another. Sufficient was brought out by these inquiries to arouse suspicion with respect to the defendant's honesty in connection with those transactions, and he was required to testify, over objection and exception, that Fiske was indicted here, and he was asked if one Aldhouse, of Boston, whom he knew, was not convicted of grand larceny in Massachusetts; but sufficient facts were not brought out to show that he was guilty of any crime in connection with those transactions. One of the requests called for an instruction that defendant was not being tried for participation in any other trans-

action, and that, if he had no guilty connection with the transaction specified in the indictment, he should be acquitted, and a separate request asked for a charge that there was no proof that any other transaction which he participated was criminal or illegal. No instructions were given on these points, and while the learned trial justice charged generally that the defendant was entitled to an acquittal unless he was guilty as charged in the indictment, yet, in the circumstances of this case, the jury should have been instructed with respect to the effect of the evidence concerning the other transactions.

It appears that counsel for the people, in opening the case, conceded that the testimony of Clark and Persch was not very reliable, on account of their confessions of guilt in this transaction and the prior conviction of Clark and the arrest of Persch on another prior charge of grand larceny, from which he received immunity by testifying for the people; but it was charged, in effect, that the defendant was in no position to criticise their past, or was no better than they, for he became their partner and "a man is known by the company he keeps." There is no doubt that that was one of the damaging facts that led to the conviction of the defendant. The court was requested to charge two requests on this point, viz.: (1) That the existence of intimate relations is not a circumstance from which participation in guilty acts of associates is to be presumed; and (2) that such relations are consistent with innocence. No instructions with respect to this were given in the main charge, and at its close the court was again requested to charge these requests, and after some discussion charged the former, but not the latter. The request was clearly drafted to state a correct abstract proposition of law (People v. Courtney, 28 Hun, 589–593; People v. Kathan, 136 App. Div. 303–308, 120 N. Y. Supp. 1096), and should have been granted in its entirety, especially in view of defendant's testimony that he knew nothing derogatory to Persch and Clark, which was uncontroverted. It is probable that the jury attached too much importance to his having become their partner.

The court was also requested to instruct that, if the actions or conduct of the defendant following the taking of the stock indicated that he approved of the act, "such approval does not necessarily make him an aider or abettor." The refusal to so charge was error. See Stover v. People, 56 N. Y. 315.

The court was also requested to charge that, in considering the testimony of Clark, they must consider his motive and the fact that he had been promised immunity, and that the testimony of an accomplice that he took the stock is not evidence that the defendant induced him to take it, *and the fact that two or more accomplices testified to the commission of the crime does not dispense with the necessity of corroboration.* No specific instructions were given on these points. The court charged that the defendant could not be convicted on the testimony of Clark and Sherwood, "unless they each be corroborated by other evidence as tends to connect this defendant with the commission of the crime." The court was separately requested to charge that Birmingham, Kaufmann, and Ulmann were accomplices. I think the

court should have so charged as to Kaufmann, at least, and that the exception to such refusal presents reversible error.

On the subject of accomplices the court, after instructing the jury that Sherwood and Clark were accomplices, stated that it was for the jury to determine whether there were other accomplices, and that a conviction cannot be had on the testimony of accomplices alone. The court was also requested to instruct the jury that the fact that—

"two or more accomplices testify to the commission of a crime does not dispense with the necessity of corroboration, and the same amount of evidence is required to connect the defendant with the crime as if there had been but one accomplice."

This request involved a correct proposition of law, and it should have been charged. It was not covered by the specific charge with respect to the testimony of Clark and Sherwood.

After properly instructing the jury with respect to the corroborative evidence required in the case of accomplices, and that an accomplice was one so connected with the crime that he might himself be convicted therefor, the court instructed the jury that where a confession is made by an accomplice, which is consistent with and corroborated by other testimony of witnesses whom the jury believe to be honest and truthful, the testimony of the accomplice then—

"became testimony of such an order as entitled you to give it great consideration notwithstanding the fact that it is the testimony of an accomplice."

An exception to this charge was duly taken on the ground that the court unduly emphasized the importance of the testimony of the accomplice, by stating that it was in such case to be given "great consideration," which was not a question of law for the court, but of fact for the jury (see People v. Ferraro, 161 N. Y. 365–379, 55 N. E. 931), and the court did not modify the charge.

The importance of the errors in the charge with respect to these requests as to accomplices is emphasized by the fact that the jury, after being sent out, came into court, and at their request the testimony of Kaufmann was read to them. Birmingham's assistant, called by the prosecution, was permitted, without objection or exception, to testify to a conversation with defendant's father, upon whom he called with a view to having defendant get into communication with Birmingham, so that the latter would help him, at least, by not volunteering evidence against him. His testimony was hearsay, and utterly incompetent, and it must have been prejudicial to defendant; for he stated that Birmingham knew that defendant received $10,000 from this transaction, and used $8,500 of it to pay gambling debts, and stated to a friend a few days before, in substance, that he had a game that beat gambling at the club "all hollow." "I am going to make $13,500 without putting up a dollar." In the circumstances, it cannot be said that the conviction was had upon the competent evidence in the case.

I am also of opinion that the reception of Exhibit 17 over objection on the part of the defendant constitutes reversible error. That exhibit was received to corroborate the testimony of Clark, who was the

author of it, and the ruling is sought to be sustained by Matter of Hesdra's Will, 119 N. Y. 617, 23 N. E. 555, which held that, where a subscribing witness to a will died before the will was admitted to probate, his declarations were competent to impeach the execution of the will, so far as his signature as a subscribing witness was concerned, precisely the same as if he had been called as a witness, and that where such impeaching evidence was given it was competent to show by other witnesses prior declarations of the subscribing witness during the life of the testator to the effect that the will had been made and that he was a subscribing witness. The court, however, expressly stated that the ruling was not intended as a modification of the general rule that, when it is shown that a witness has made declarations inconsistent with his testimony, he cannot be corroborated by showing that he made declarations consistent therewith, but was an exception thereto, and the court confined the exception to cases in which the witness is charged with giving testimony under the influence of some motive prompting him to give a false or colored statement, in which case it may be shown that he made similar declarations at a time when the imputed motive did not exist, and to cases where evidence is offered tending to show that an account of a transaction given by a witness is a fabrication of a late date, when it may be shown in contradiction of such evidence that he gave the same account "before its ultimate operation and effect arising from a change of circumstances should have been foreseen." I am of opinion that this evidence was not admissible within the ruling of the court in that case.

The assistant district attorney, in opening the case, announced that Clark had been previously convicted of forgery, and had served a term in a reformatory, and that he had been promised immunity in this case. The only additional fact of importance brought out on his cross-examination tending to affect his credibility was that, after being arrested on account of his connection with the transactions in question, he was also indicted for stealing diamonds, of the value of $6,000, from his mistress. On redirect examination he was permitted to testify, over objection and exception duly taken in behalf of the defendant, that after his arrest in connection with the transaction involved on this appeal, but before his indictment for stealing from his mistress, he consulted two attorneys, and dictated a statement to a stenographer in the office of one of them, and subsequently received a transcript of it from the other attorney, and thereupon the statement was offered, received, and read in evidence, without further proof with respect to when or by whom it was prepared. It appears to be a statement of facts with respect to the transactions now in review, and with respect to the part taken by those who participated therein. It contains no statement with respect to some of the material evidence given by Clark on the trial of this indictment; but in part it tends to corroborate his testimony, and in other respects is more damaging to defendant than Clark's testimony given upon the trial. The learned court attempted by the charge to properly limit the effect of this evidence to corroborating the testimony of Clark. Although Clark had not been promised immunity at the time he says he dictated the

statement, it cannot be said that he was not actuated by the same motive in preparing the statement as he was in giving his testimony on the trial; for if his testimony, wholly uncorroborated, is to be accepted as to the time when he made the statement, it is manifest that he was influenced in making it by a desire to obtain immunity and to have the people use him as a witness against the others who were implicated at the same time. This statement, which from a legal standpoint had no probative force in corroborating the testimony of Clark, was given full effect as corroborative evidence by its reception and by the instructions to the jury with respect thereto.

I have examined this record with great care, and I am not satisfied that the competent evidence in the case establishes the guilt of the defendant, and I am convinced that the jury was influenced in reaching the verdict of guilty by incompetent evidence and errors committed upon the trial, and therefore, in the interests of justice, the judgment of conviction should be reversed, and a new trial granted.

I therefore vote for the reversal of the judgment of conviction and for a new trial.